Nancy S. KEENEY, Plaintiff–Appellant,

v.

David R. HEATH, individually and in his official capacity as Sheriff of Tippecanoe County; Steve Grant, Captain, individually and in his official capacity as Jail Commander; and Tippecanoe County, Defendants–Appellees.

No. 95–1091.

United States Court of Appeals,
Seventh Circuit.

Argued May 10, 1995.

Decided June 15, 1995.

Ivan E. Bodensteiner, Valparaiso, IN (argued), for plaintiff-appellant.

Lawrence B. O'Connell, John H. Meyers (argued), Lafayette, IN, for defendants-appellees.

Before POSNER, Chief Judge, and WOOD, Jr. and COFFEY, Circuit Judges.

POSNER, Chief Judge.

Nancy Summers was a guard at the Tippecanoe (Indiana) County Jail in 1991. Mitch Keeney was one of the prisoners, serving a sentence for a property offense. They became acquainted. Captain Grant, the commander of the jail, became suspicious that Mitch and Nancy might be romantically involved (whether they actually were or not, at this stage of their acquaintance, we do not know), and so he had Mitch transferred to another facility of the Indiana Department of Corrections, the prison at Pendleton, Indiana. The transfer took place on May 1, 1991. Mitch and Nancy then began to correspond. Beginning early in June, Nancy began visiting Mitch frequently at the Pendleton prison. In September, in response to inquiries from Captain Grant, Nancy acknowledged that she had a relationship with Mitch, was visiting him regularly, and planned to marry him. Captain Grant told her that she must give up Mitch or give up her job, pursuant to a regulation of the jail forbidding employees to "become involved socially with inmates in or out of the [jail]." She resigned, and on June 6 of the following year married Mitch. They were divorced in 1994. Her suit against Grant and the county sheriff, filed under 42 U.S.C. § 1983, claims that in forcing her to choose between her job and marriage to the man of her choice, the defendants infringed her constitutional right to marry. The district court granted summary judgment for the defendants, and this appeal ensued.

The due process clause of the Fourteenth Amendment has been interpreted to create a right to marry with which the state can interfere only upon a showing that the interference is necessary. E.g., *Zablocki v. Redhail*, 434 U.S. 374, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978); *Niehus v. Liberio*, 973 F.2d 526, 532 (7th Cir.1992). The defendants did not, of course, forbid Nancy Summers (now Nancy S. Keeney) to marry; they did not even forbid her to marry Mitch; but they made it more costly for her to marry him, the cost being the loss of her job, or more precisely the loss of whatever margin made it a better job for her than any other that she could get. By doing this the defendants undoubtedly burdened her right to marry, though they did not deter her from marrying. They could impose a burden of this character, in the face of the constitutional "right to marry," only if they had some justification, though as *Parks v. City of Warner Robins*, 43 F.3d 609, 616 (11th Cir.1995), made clear in upholding a city's anti-nepotism rule applied to spouses, they do not need as much justification as they would need if, as in *Turner v. Safley*, 482 U.S. 78,

107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), they were actually forbidding marriage.

The plaintiff's able counsel concedes that if in September 1991, when Nancy acknowledged her relationship with Mitch to Captain Grant, Mitch had still been an inmate in the county jail where she worked as a guard, the defendants' action in forcing her to resign (if she would not terminate the relationship with Mitch) would be a justifiable response to the problems of prison discipline inherent in a personal, especially a premarital, relationship between a prisoner and one of his guards. But by then Mitch was in another prison, so what harm could the relationship have done?

■ That question must be answered in the first instance by people who are responsible for running jails, and not by judges. Judges should be cautious about disparaging disciplinary and security concerns expressed by the correctional authorities. American jails are not safe places, and judges should not go out of their way to make them less safe. As long as the concerns expressed by correctional authorities are plausible, and the burden that a challenged regulation of jail or prison security places on protected rights a light or moderate one, the courts should not interfere. *Washington v. Harper*, 494 U.S. 210, 223–24, 110 S.Ct. 1028, 1037–38, 108 L.Ed.2d 178 (1990); *Turner v. Safley, supra; Block v. Rutherford*, 468 U.S. 576, 588, 104 S.Ct. 3227, 3233, 82 L.Ed.2d 438 (1984); *Johnson–Bey v. Lane*, 863 F.2d 1308, 1311 (7th Cir.1988); *Duran v. Elrod*, 760 F.2d 756, 759 (7th Cir.1985). It is true that this principle has been invoked mostly in cases involving the rights of prisoners rather than the rights of guards, and that the Supreme Court in *Dothard v. Rawlinson*, 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977), and *County of Washington v. Gunther*, 452 U.S. 161, 101 S.Ct. 2242, 68 L.Ed.2d 751 (1981), did not hesitate to interpret Title VII of the Civil Rights Act of 1964 aggressively with regard to the qualifications and pay of female prison guards. But in *Thornburgh v. Abbott*, 490 U.S. 401, 410 n. 9, 109 S.Ct. 1874, 1880 n. 9, 104 L.Ed.2d 459 (1989), the Supreme Court made clear that, so far as challenges to prison regulations as infringing constitutional rights are concerned, the standard is the same whether the rights of prisoners or of nonprisoners are at stake.

We must consider the facts of this case in light of that standard. The burden on the right to marry was light or at most moderate, not heavy. It is not as if one had to take a vow of celibacy in order to become a guard at the Tippecanoe County Jail. The regulation that we quoted earlier states no limits of time or place, but we can leave for another day the case in which it is interpreted to forbid a guard at the jail to marry a former inmate of the Gulag, or even to force a guard to resign because her spouse after their marriage committed a crime for which he is being imprisoned in another correctional facility within the same prison system. The defendants argue that the regulation would not apply in such cases. It has, no doubt, some room for interpretation, but we need not either fix the outer bounds of its meaning or determine whether those bounds lie outside the state's power to limit constitutional rights in the name of jail security. We can confine ourselves to the burden that the regulation imposed on Nancy Keeney's right to marry. That burden was not heavy.

And the benefit? Indiana has a unitary system of prisons and jails administered by the Department of Corrections. Prisoners are shuttled among these facilities. If a guard who having in the course of her duties met an inmate at one of these facilities becomes romantically involved with him after his transfer to another facility, she becomes a potential facilitator of unlawful communication between him and others and a potential provider of favored treatment for him. Knowing this, inmates will have an enhanced incentive to "romance" their female guards (the sexes can of course be reversed in this example), and the inherent difficulty of the position of female guards in mostly male prisons will be made even greater. Just the suspicion of favored treatment could create serious problems of morale. Prisoners not married or engaged to guards would attribute any differences in treatment between themselves and such prisoners to the relationship.

These considerations justify the challenged rule, at least when applied in circumstances

such as those presented in this case. The rule is less arbitrary than the one struck down in *Turner*, which forbade inmates to marry even persons wholly unaffiliated with the correctional system without a showing of compelling justification, such as the pregnancy of the prospective spouse. The burden on the right to marry was greater and the state's arguments for the rule, mainly its concern with "love triangles," did not impress the Supreme Court. Cf. *Lynk v. LaPorte Superior Court No. 2*, 789 F.2d 554, 566–67 (7th Cir.1986).

The anti-fraternization rule that Nancy Summers ran afoul of resembles the anti-nepotism rules, formerly common in law firms and universities, which forbade the hiring of spouses. These rules bear more heavily on women than on men because of women's more precarious footing in the job market. Since the ratio of male prisoners to female guards is vastly higher than the ratio of female prisoners to male guards, there is no doubt that an anti-fraternization policy of the sort enforced against Nancy Summers will impair the marital prospects of women far more than those of men. On the other hand, as we have noted, it may, by relieving pressures to which women guards would otherwise be subjected, make women guards as a whole better off. Anyway the policy is not challenged as a form of sex discrimination, but only as an infringement of the right to marry; and we remind that *Parks v. City of Warner Robins, supra,* upheld an anti-nepotism rule applied to spouses, even though it did not involve a jail or prison setting, where, as we have pointed out, the justification for such a rule, so applied, is greater.

AFFIRMED.