Larry J. SHIMER, Plaintiff–Appellant,

v.

Odie WASHINGTON and Paul Barnett, Jr., Defendants–Appellees.

No. 94–2063.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 27, 1996.

Decided Nov. 12, 1996.

Rehearing Denied Dec. 17, 1996.

James B. Speta (argued), Hille R. Sheppard, Sidley & Austin, Chicago, Il, for Plaintiff–Appellant.

Mary E. Welsh (argued), Office of the Attorney General, Civil Appeals Division, Chicago, IL, for Defendants–Appellees.

Before BAUER, FLAUM, and DIANE P. WOOD, Circuit Judges.

FLAUM, Circuit Judge.

Larry Shimer challenges an Illinois Department of Corrections policy which prohibits correctional employees from writing directly to the Prisoner Review Board on behalf of prisoners who have filed petitions for clemency. Alleging that this policy violated the First Amendment, Shimer filed a *pro se* complaint under 42 U.S.C. § 1983 against Howard Peters and George E. Detella, respectively Director and Warden of the Illinois Department of Corrections. The district court granted summary judgment for the prison administration. The court doubted whether Shimer had standing to challenge the prison policy, but determined that the policy was constitutional irrespective of the standing issue. Shimer appeals. We reverse and remand.

## I.

Shimer is an inmate at the Illinois Correctional Center in Danville. In October of 1992, Shimer filed a petition for clemency. He desired that prison guards be permitted to write to the Prisoner Review Board in support of his petition. After making a series of inquiries, Shimer was informed that the unwritten prison policy is that prison employees may not write the Prisoner Review Board directly. Shimer submits that several prison guards have indicated their willingness to write on Shimer's behalf, but refrain from doing so in light of this policy.

## II.

■ To create a justiciable cause of action, Larry Shimer must have standing before this court. First, we inquire whether Shimer can satisfy Article III's "case or controversy" requirement. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559, 112 S.Ct. 2130, 2135–36, 119 L.Ed.2d 351 (1992). To achieve standing, Shimer must show that he has suffered an actual or threatened injury, which may be traced to the challenged action, and which is likely to be redressed by a favorable decision. *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 758–59, 70 L.Ed.2d 700 (1982).

■ In our judgment, Shimer satisfies the injury-in-fact, causality, and redressability requirements of standing. Shimer has petitioned the state for clemency; we assume his petition is pending. Shimer alleges that prison guards would have written letters to the Prisoner Review Board, but for the policy. Without the guards' letters before them, the Board has less information about Shimer. We note that this information may be particularly pertinent, as it is the guards who have daily contact with Shimer and therefore can realistically assess his person.[1] Assuming that the letters would reflect that Shimer is a fit candidate for clemency, their absence at his hearing will affect him adversely. While

Shimer has not shown the ultimate injury, the denial of clemency, he has shown that the policy may hinder the flow of information—a procedural defect which may act to his detriment. "All that a plaintiff need show to establish standing to sue is a reasonable probability—not a certainty—of suffering tangible harm unless he obtains the relief that he is seeking in the suit," *Hoover v. Wagner*, 47 F.3d 845, 847 (7th Cir.1995). We therefore conclude that Shimer has suffered injury-in-fact caused by the prison's policy. A favorable decision by this court, *i.e.*, an injunction of the prison's policy, would allow the prison guards to write directly to the Board and would remedy an informational shortcoming in the clemency proceedings.

■ In addition to the constitutional elements of standing embodied in Article III, the federal judiciary has established certain prudential boundaries on standing. Here, Shimer threatens to run afoul of our limitation on third-party standing. A litigant must generally assert his or her own legal rights and interests, *Warth v. Seldin*, 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). To establish third-party standing, we require that a litigant, in addition to alleging injury-in-fact, allege a sufficiently close relationship with the third party so that the court is assured that the litigant will be an effective proponent of the cause, *Powers v. Ohio*, 499 U.S. 400, 411, 111 S.Ct. 1364, 1370–71, 113 L.Ed.2d 411 (1991), and we consider whether there is some hindrance to the third party's ability to protect his own interest. *Id.*

■ However, in the area of First Amendment litigation, the federal courts have relaxed their prudential concern with regard to third-party standing because of the challenged law or regulation's potential chilling effect on protected expression. *Secretary of Maryland v. Joseph H. Munson Co.*, 467 U.S. 947, 956, 104 S.Ct. 2839, 2846–47, 81 L.Ed.2d 786 (1984) (fund-raising organization allowed to assert First Amendment rights of

---

1. The Illinois Administrative Code governing clemency reflects a desire to collect information on the clemency petitioner. The Rules Governing Petitions for Executive Clemency provide for publication of the prisoner's intent to petition for executive clemency in a widely circulated newspaper; the notice invites any interested party to communicate with the offices of the Prisoner Review Board. Ill. Admin. Code tit. 20 § 1610.180(c) (1994).

charities). In *Munson*, the Supreme Court wrote, "Litigants … are permitted to challenge a statute not because their own rights of free expression are violated but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Id.* at 956–57, 104 S.Ct. at 2847 (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 612, 93 S.Ct. 2908, 2916, 37 L.Ed.2d 830 (1973)); *Virginia v. American Booksellers Ass'n, Inc.*, 484 U.S. 383, 392–93, 108 S.Ct. 636, 643, 98 L.Ed.2d 782 (1988) (book sellers asserting First Amendment rights of book buyers). The stringent requirements for third-party standing are rooted in prudence, rather than the Constitution; accordingly, where circumstances warrant and the Supreme Court allows, we may ease the strictures. Our concern that a law will stifle protected speech justifies such allowance of third-party standing.

This Circuit has followed the Supreme Court's lead in refusing to place a premium on prudence in the First Amendment context. In *Penny Saver Publications v. Village of Hazel Crest*, 905 F.2d 150 (7th Cir. 1990), we allowed a newspaper to assert the rights of its advertisers. The challenged ordinance applied to solicitation—usually not the business of newspapers, but of the advertisers. Following *Munson*, we put third-party standing concerns aside in the face of a First Amendment challenge and allowed the newspaper to sue in the advertisers' stead. *Penny Saver*, 905 F.2d at 154.[2] In the instant case, we elect to do the same. The assurance of a cautionary approach to standing, requiring Shimer to demonstrate legitimacy as a third-party litigant, is outweighed by the potential chilling effect on prison guards' protected speech.

2. We note that we have not always been so lenient with third-party First Amendment litigants. In *Shanahan v. City of Chicago*, 82 F.3d 776, 780 (7th Cir.1996), a First Amendment challenge to an internal decision of the Chicago Fire Department, we adhered to third party standing analysis and denied the litigant standing. In *Shanahan*, the court relied upon *Caplin & Drysdale Chartered v. United States*, 491 U.S. 617, 623–24 n. 3, 109 S.Ct. 2646, 2651 n. 3, 105

## III.

Having determined that Shimer has standing to pursue this claim, we turn next to the standard governing the adjudication of constitutional rights within prison. While the chilling effect on protected speech may be as significant within prison walls, we hold prison administrations to a less stringent standard where constitutional rights are in question. This more deferential standard is applied to both the rights of prisoners and the rights of nonprisoners within prison walls, *Keeney v. Heath*, 57 F.3d 579, 581 (7th Cir.1995), so that we apply it here, where the First Amendment rights of prison guards, rather than prisoners, are infringed.

■ We ask of the prison administration only whether its policy is reasonably related to a legitimate penological interest. *Thornburgh v. Abbott*, 490 U.S. 401, 413, 109 S.Ct. 1874, 1881, 104 L.Ed.2d 459 (1989). To satisfy this inquiry we adhere to a four factor test: we ask (1) whether a valid, rational connection exists between the regulation and a legitimate government interest behind the rule; (2) whether there are alternative means of exercising the right in question; (3) what impact accommodation of the asserted constitutional right would have on guards, other inmates, and on the allocation of prison resources; and (4) what easy alternatives exist to the regulation because, although the regulation need not satisfy a least restrictive alternatives test, the existence of obvious alternatives may be evidence that the regulation is not reasonable. *Turner v. Safley*, 482 U.S. 78, 89–90, 107 S.Ct. 2254, 2262, 96 L.Ed.2d 64 (1987); *Williams v. Lane*, 851 F.2d 867, 877 (7th Cir.1988). In order to make this inquiry, we need information.

■ The prison administration must proffer some evidence to support its restriction of prison guards' constitutional rights. See *Ki-*

L.Ed.2d 528 (1989) (a third-party Sixth Amendment claim citing *Eisenstadt v. Baird*, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972) (a third-party equal protection claim)). We conclude from the decision that the line of cases excepting First Amendment cases from third party standing analysis was not before the panel. Because *Shanahan* does not rely upon or consider *Munson* or *American Booksellers*, it does not impact our assessment of this case.

*kumura v. Turner,* 28 F.3d 592, 598–99 (7th Cir.1994); *Alston v. DeBruyn,* 13 F.3d 1036, 1040 (7th Cir.1994); *DeMallory v. Cullen,* 855 F.2d 442, 448 (7th Cir.1988). The prison administration "cannot avoid court scrutiny by reflexive, rote assertions." *Williams,* 851 F.2d at 886 (Flaum, J., concurring).

The prison administration lists its interests in the policy for us: the protection of prison guards from retaliation for negative evaluations, from the temptation of bribes for positive evaluations, and from the "danger of more sinister and coercive methods." The prison officials insist that, the "nexus between the State's interests and the policy at issue thus requires no speculation." We cannot, based on this record, accept such a conclusion.

We, in fact, are reduced to speculation when not provided with evidence, and, having speculated, find it difficult to establish a connection between the prison administration's unsubstantiated justifications and its policy. In the way of submissions to the district court, all that was provided were the prison regulations, which do not contain the disputed policy, and an affidavit of Patricia Lubben, manager of the prison policy unit, who states only the policy, with no illumination as to its purpose. Guards possess immense control over the lives of inmates. It is not currently obvious to the court that an additional instance where a guard is able to tangentially help an inmate is likely to lead to an increase of corruption and coercion. Evidence to suggest this connection should be at the heart of the *Turner* analysis.

Particularly puzzling to us is that prison guards are able to write letters to an inmate's master file, which prison officials purport to make available by request to the Prisoner Review Board.[3] Presumably inmates know of the guards' ability to write the master file and the same institutional risk, posited by the prison administration above, attaches to this policy. Without evidence or argument to the contrary, these policies would appear inconsistent.

We tread cautiously when impacting in a prison system and are cognizant of our relative naivete when it comes to the reality of security risks. *Keeney,* 57 F.3d at 581. However, we do engage in an actual, albeit limited, inquiry. Appellees must provide the court with something—an affidavit from a prison official setting out the policy and the reasons for it; precedent policies; regulatory history; academic literature—on which to hang their clemency communication policy.

Although we remain acutely aware of our remove from the day to day logistics of managing a prison, we suggest that perhaps our insistence on some evidence to support this policy will provide the prison administration with an opportunity to review its current ban on direct communication between prison guards and the Board. We recognize that prison populations are burgeoning and we imagine clemency petitions to be increasing at a commensurate rate. With expanded opportunity in the future, letters from prison guards written directly to the Prisoner Review Board could arguably both inform the Board and provide an incentive for model prisoner behavior. On the heels of this observation, we hasten to add that such policy making, consistent with the law, is, of course, wholly in the hands of the prison administration. It is not necessary that we agree with the prison administration's chosen course, but only that we be able to point to some rational basis for it.

Accordingly, we Reverse the decision of the district court granting appellees' motion for summary judgment and Remand the case to the district court for further fact-finding to illuminate the challenged policy.

---

**3.** Shimer disputes that the Prisoner Review Board has complete access to inmates' files. On summary judgment we view the record in the light most favorable to Shimer, so that this unresolved assertion does not impact our standing analysis.