CLAY, Circuit Judge,
concurring in part and dissenting in part.
The majority applies both the Pickering/Connick balancing test and the Za-blocki “direct and substantial interference” test to Plaintiffs’ challenge to various iterations of the MDOC Work Rule. As to the Pickering/Connick balancing test, the majority opinion correctly distinguishes between government employee speech that is a matter of public concern and that which is a matter of private concern. Restrictions on the former are subject to “intermediate scrutiny” — a balancing between the interests of the employee and the interests of the government. Private concern speech, by contrast, is subject to rational basis review. Although it is true that this Court has applied the Pickering/Connick test to restrictions on associations, see Boats v. Gray, 775 F.2d 686, 692 (6th Cir.1985), such an application may not always do justice to the particular associational interests at stake. For example, the right to marry is recognized as a fundamental associational interest. Marriage, however, is purely a matter of private concern. Thus, it receives insufficient protection when applying the Pickering/Connick test. See Balton v. City of Milwaukee, 133 F.3d 1036, 1039-40 (7th Cir.1998) (“A Pickering/Connick balancing test, so useful in resolving public employee free speech cases, is not easily transferable to freedom of association cases. That’s because some associational choices — for instance, whom to marry — are purely private matters. As such, one would think they would usually come up short in a *1045 private versus public concern balancing test.”) (citation omitted).
As to the Zablocki “direct and substantial interference” test, this Court has held that, in the employment setting, strict scrutiny applies to a governmental policy or action that “is a direct or substantial interference” with the asserted associational interest. Montgomery v. Carr, 101 F.3d 1117, 1124 (6th Cir.1996) (citing Zablocki v. Redhail, 434 U.S. 374, 383-84, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978)). If the policy or action does not directly or substantially interfere with that interest, then rational basis review applies. Id.
The majority is not without a prece-dential basis for applying these two tests to the associational rights of correctional employees. See, e.g., Ross v. Clayton County, 173 F.3d 1305, 1310-12 (11th Cir.1999) (applying Pickering/Connick test to correctional officer’s claim that his demotion for associating with his probationer-brother violated his First Amendment rights); Serrano v. Multnomah County, 64 Fed.Appx. 21, 2003 WL 1827230, at *1 (9th Cir. Apr.7, 2003) (applying Zablocki “direct and substantial” test to claim by juvenile group detention worker that her termination for having a personal relationship with a juvenile detainee violated the First Amendment). But the Supreme Court has made it quite clear that prisons are unique to other governmental settings and that, regardless of whether the plaintiffs are prisoners or non-prisoners, there is a single test for the propriety of governmental action that arguably restricts First Amendment rights — the four-factor “legitimate penological interests” test, most recently applied in Overton v. Bazzetta, 539 U.S. 126, 123 S.Ct. 2162, 156 L.Ed.2d 162 (2003). The majority, like the district court below, failed to apply this test to the facts of this case. As a consequence, I disagree with the majority’s reasoning and concur only in part with its judgment.
I.
FACTUAL OVERVIEW
Plaintiffs challenge various iterations of the MDOC Work Rule that prohibits, inter alia, non-work-related contact between MDOC employees and inmates, parolees, probationers or their family members and inmates’ visitors. This prohibition originally was contained in the MDOC’s Work Rule 12. That Rule prohibited “[ijmproper or overly familiar conduct with prisoners, parolees or probationers or their family members and visitors.” (J.A. 34.) Violations of the Rule subjected the employee to “disciplinary action up to and including dismissal.” Id. Examples of improper actions included exchanging “letters, money or items” with a prisoner; living with a probationer or parolee, except where the probationer or parolee was a spouse of the employee and the marriage existed prior to the employment date, or where the spouse became a probationer or parolee after the employment date and the marriage was pre-existing; being at the home of a prisoner, parolee or probationer other than for official business; giving a prisoner the employee’s home telephone number; and sexual contact with a prisoner. Id. Work Rule 12 also required that “[a]ny contact” with a prisoner, parolee or probationer, or their family members outside of the job be reported to the Warden. (J.A. 35.) Examples of unauthorized contact included contact with a prisoner by writing or by telephone outside of the official work setting and visiting prisoners without authorization.
The MDOC repromulgated Work Rule 12 as Work Rule 24 in June of 1996. Work Rule 24 prohibited MDOC employees from “overly familiar conduct with prisoners, parolees, probationers, family member(s) of a prisoner, parolee or proba *1046 tioner, or visitors.” (J.A. 293.) The Rule prohibited romantic or sexual contact with such individuals as well as “any contact” with such individuals “outside the performance of the employee’s job.” Id. The Rule required the MDOC employee to report “any unavoidable contact” to his or her immediate supervisor. Id. The supervisor would then determine whether a written report of the contact should be sent to the employee’s warden.[1] Examples of prohibited contact with offenders, their family members or visitors included exchanging “letters, money, telephone numbers or anything,” being at the home of any of these individuals for reasons other than official MDOC business and “[n]on-work related contact” with any of these individuals. Id. at 294. Any violations of the Work Rule would be grounds for dismissal.
Effective September 17, 1999, MDOC Work Rule 24 was abolished and new Work Rule 46 was implemented. Work Rule 46 defined the term “offender” to mean a “prisoner or parolee under the jurisdiction of the Michigan Department of Corrections or housed in a Department facility, or a probationer who is supervised by an employee of the Department.” Id. It preserved Work Rule 24’s prohibitions against (1) overfamiliarity with an offender, their family members or their visitors; (2) contact with such individuals outside the regular performance of the employee’s job; and (3) the duty to report unavoidable contact. The new Work Rule also provided the same examples of prohibited contact, such as receiving letters, money or telephone numbers; being at the home of any such individual other than for official business; and any other non-work-related contact.
On April 24, 2000, the MDOC promulgated a revised Work Rule 46. The revised Rule defined “family member” to mean “parents, stepparents, spouse, children, stepchildren, siblings or step siblings.” (J.A. 297.) It also changed the prohibition against contact with a prisoner’s visitors to a prohibition against contact with “lead visitors,” defined to mean a person on an offender’s approved visitors list. Id. The revised Rule preserved the prohibition against the provision of lodging for certain offenders and similarly continued to require the reporting of unavoidable contact with offenders, their family members or their visitors. The revised Rule also continued to prohibit “any contact” with an offender outside the regular performance of an employee’s job and preserved the various examples of overfamil-iarity from the prior Rule (e.g., letter-writing, being at the residence of an offender). The revised Rule somewhat relaxed the prohibition against any contact with an offender’s family members or visitors outside of the job by permitting such contact with prior written approval. The Rule omitted language that any violation would be grounds for dismissal, but still appeared to acknowledge that an employee could be discharged for violating the Rule.
In Michigan, there are approximately 13,000 people on parole, 65,000 people on probation and 45,000 people incarcerated. Thus, Work Rule 46 prohibits any non-work-related contact between any of the 17,000 MDOC employees and approximately 120,000 Michigan “offender” residents. There are no clear figures in the record as to how many family members the 120,000 *1047 offenders have, but it is estimated to be in the hundreds of thousands.
The MDOC terminated Plaintiff Dawn Akers, a bookkeeping clerk at a correctional facility, pursuant to former Work Rule 24 because she had given a parolee several rides in her ear during her off-duty hours (to the hospital and to Lansing for a job search). Pursuant to former Work Rule 12, the MDOC terminated Plaintiff Kim Loranger, a probation officer, who had written a few letters to an inmate whom she had dated eight years earlier, before the inmate had been incarcerated. Both Plaintiffs have since been reinstated to their employment, however, both seek to have the discipline for violating the Work Rules expunged from their employment records. Plaintiff Loranger and Plaintiff UAW Local 6000 seek to prospectively invalidate the current Work Rule 46.
II.
PLAINTIFFS’ CLAIMS AGAINST DEFENDANTS IN THEIR OFFICIAL CAPACITIES
A. Legal Standards
In Overton v. Bazzetta, 639 U.S. 126, 123 S.Ct. 2162, 156 L.Ed.2d 162 (2003), the Supreme Court addressed the validity of the MDOC’s prison visitation policies which, among other things, limited the visitors a prisoner was eligible to receive. The asserted goal of the regulations was to decrease the total number of visitors because prison officials had found it more difficult to maintain order during visitation and to prevent smuggling or trafficking in drugs. Bazzetta, 539 U.S. at -, 123 S.Ct. at 2166. The plaintiffs included prisoners, their friends and their family members. Id. The Court acknowledged that “outside the prison context, there is some discussion in our cases of a right to maintain certain familial relationships, including association among members of an immediate family and association between grandchildren and grandparents.” Id. at 2167 (emphasis added; citations omitted). The challenge to the MDOC’s prison visitation policies, however, was “not an appropriate case for further elaboration of those matters.” Id. The Court reasoned that “freedom of association is among the rights least compatible with incarceration” and that “[s]ome curtailment of that freedom must be expected in the prison context.” Id. The Court therefore held that the MDOC’s policies did not unduly infringe on the prisoners’ rights of intimate association because “the challenged regulations bear a rational relation to legitimate peno-logical interests.” Id. (citing Turner v. Safley, 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987)).
Although the Court in Bazzetta did not separately discuss the standard of scrutiny applicable to the intimate association rights of prisoners’ friends and family members, the Court acknowledged that the plaintiffs included friends and family members of prisoners. Moreover, the Court previously had held that the associational rights of non-prisoners are no greater than the rights of prisoners with whom they wish to associate. See Thornburgh v. Abbott, 490 U.S. 401, 410 fn. 9, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989) (holding that the “legitimate penological interests” standard applies to alleged associational infringements on prisoners and non-prisoners alike). Logically, therefore, the “legitimate penological interests” test should apply in this case, where correctional officers, although not prisoners themselves, are integrally related to the prison setting and wish to associate with former inmates and/or inmates’ family members. See Shimer v. Washington, 100 F.3d 506, 509 (7th Cir.1996) (applying Thornburgh v. Abbott to claimed First Amendment right of prison guard to write to a prisoner review board on behalf of prisoners who had filed petitions for clem *1048 ency); Keeney v. Heath, 57 F.3d 579, 581-82 (7th Cir.1995) (applying Thornburgh v. Abbott to claimed First Amendment right of prison guard to marry a prisoner without being threatened with termination).
The majority argues that the Work Rule mostly implicates associations with non-prisoners, such as relatives and visitors of offenders. It therefore concludes that the “legitimate penological interests” test is inapplicable to the Work Rule because “in general there is no prisoner nexus, but there always is an employment nexus.” This argument defies common sense and ignores the undisputed facts of this case. The MDOC has sought to justify the Work Rule as it applies to both the offender class and the class of relatives and visitors based solely on the Rule’s relation to the preservation of prison security. But for the asserted security concerns implicated by MDOC employees’ contacts with both classes of individuals, there would be no Work Rule. If, as the majority states, there is “in general no prisoner nexus,” then it is difficult to see how the Work Rule survives even rational basis scrutiny. The Work Rule is nothing like employment regulations that require pledges to support the Constitution or preclude moonlighting or partisan political activity, which typically would be based on the employer’s general interest in maintaining employee morale or an efficient and loyal workforce. These types of employment regulations are not necessitated by or unique to the prison setting. In contrast, prisoners undeniably are the reason for the MDOC’s Work Rule. The fact that the Rule can be classified more generally as an employment regulation should not blind this Court to the specific reality that it is a prison regulation. Accordingly, the “legitimate peno-logical interests” test is not “superfluous,” as the majority claims.
The “legitimate penological interests” standard is highly deferential to prison administrators. Although “[w]e must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining legitimate goals of a corrections system and for determining the most appropriate means to accomplish them,” Bazzetta, 123 S.Ct. at 2167 (citations omitted), this deference is by no means absolute. Accordingly, the Supreme Court has provided the following guidance in assessing whether a prison regulation serves legitimate penological interests:
In Turner we held that four factors are relevant in deciding whether a prison regulation affecting a constitutional right that survives incarceration withstands constitutional challenge: whether the regulation has a “valid, rational connection” to a legitimate governmental interest; whether alternative means are open to inmates to exercise the asserted right; what impact an accommodation of the right would have on guards and inmates and prison resources; and whether there are “ready alternatives” to the regulation.
Id. (citing and quoting Turner, 482 U.S. at 89-91, 107 S.Ct. 2254; internal quotation marks and citation omitted). The party seeking to invalidate the prison regulation bears the burden of proof regarding these four factors. Id. at 2168. As discussed below, even under this highly deferential test, parts of the challenged MDOC Work Rule are unconstitutional.
B. Analysis
1. Valid, rational connection to a legitimate governmental interest
Regulations that promote internal security are “perhaps the most legitimate of penological goals,” Bazzetta, 539 U.S. at -, 123 S.Ct. at 2168 (citation omitted); however, there still needs to be a “logical connection between this interest and the *1049 regulations.” Id. (MDOC’s regulations “prohibiting visitation by former inmates bears a self-evident connection to the State’s interest in maintaining prison security and preventing future crimes”). The logical connection between the regulation and the asserted goal cannot be “so remote as to render the policy arbitrary or irrational.” Turner, 482 U.S. at 89-90, 107 S.Ct. 2254. Moreover, where “the nature of the asserted governmental interest is such as to require a lesser degree of case-by-case discretion, a closer fit between the regulation and the purpose it serves may safely be required.” Abbott, 490 U.S. at 412, 109 S.Ct. 1874; see also id. at 416, 109 S.Ct. 1874 (“we are comforted by the individualized nature of the determinations required by the regulation” which prohibited a prisoner from receiving a publication only when the warden determined that it was “detrimental to the security, good order, or discipline of the institution or ... might facilitate criminal activity”) (internal quotation marks and citations omitted).
In Turner, the Court found that a prison rule barring inmate-to-inmate correspondence was reasonably related to legitimate security interests. Turner, 482 U.S. at 91, 107 S.Ct. 2254. The Court observed, “Undoubtedly, communication with other felons is a potential spur to criminal behavior: this sort of contact frequently is prohibited even after an inmate is released on parole.” Id. (citation omitted). The Court upheld the regulation because it barred communication only with a “limited class of other people with whom prison officials have particular cause to be concerned — inmates at other institutions within the Missouri prison system.” Id. at 92, 107 S.Ct. 2254 (emphases added).
a. Contact with inmates, parolees and probationers
The reasoning in Turner easily can be applied to the portion of the challenged MDOC Work Rule that prohibits non-work-related relationships with prisoners or former prisoners. MDOC officials have asserted that any type of non-professional relationship with an offender is cause for discharge because of “serious security concerns in correctional facilities and concerns regarding the integrity of supervision of offenders in communities.” (J.A. 215.) (Affidavit of Marsha Foresman, Special Assistant to the MDOC Director, at ¶ 6).[2] I agree, based on Turner, that relationships between MDOC employees and inmates or former inmates could be a spur to criminal behavior or facilitate criminal behavior. Personal relationships with inmates and former inmates, whether romantic or otherwise, could undermine security and order in the prison or the integrity of the probation supervision process. Cf. Keeney, 57 F.3d at 581 (holding that a guard’s romantic involvement with *1050 an inmate could make her “a potential facilitator of unlawful communication between [the inmate] and others and a potential provider of favored treatment for him”).
The fact that a particular MDOC employee has no explicit supervisory authority over the offender and may have little or no ability to effect changes to the offender’s status does not change the analysis. In establishing prison regulations, “a line must be drawn.” Bazzetta, 539 U.S. at -, 128 S.Ct. at 2168 (reasonable to limit child visitors by prohibiting visits by nieces, nephews and children as to whom parental rights had been terminated). It is reasonable for the MDOC officials to conclude that (a) the risk to prison security is too great, however remote that risk may be in the vast majority of relationships with offenders; and (b) even innocent relationships with offenders tend to undermine offenders’ respect for the prison authorities, thereby comprising the authority and control of those MDOC employees who actually supervise them. This Court also cannot ignore the potential administrative costs that the MDOC would incur by having to conduct a case-by-case assessment of relationships with offenders.
For these reasons, I agree with the majority as far as Work Rule 46 legitimately prohibits any non-work-related relationships between MDOC employees and offenders, with one caveat. As presently written, Work Rule 46 prohibits “any contact” with an offender outside the regular performance of an employee’s job and further imposes a duty to report any “unavoidable contact” to a superior and potentially to the Warden. (J.A. 298.) As far as potential discipline is concerned, the Rule draws no distinction between intentional contact with an offender outside of work and incidental or even unknowing contact. In this regard, Plaintiffs have complained that MDOC employees could not attend an Alcoholics Anonymous meeting, a political campaign meeting, a religious service, a PTA meeting or a bowling league event if any attendees at those meetings are on parole or probation. Appellants Br. at 12. In addition, Michael Devine, a union representative with Plaintiff UAW Local 6000, testified that at one point in time there were twelve homes on his block in which 12 offenders lived. If he were still employed as a probation officer with the MDOC, he could not have any contact with his neighbors. Plaintiffs point out that such contacts would be unavoidable, yet would be cause for termination.
I submit that the Rule is not reasonably related to legitimate penological interests to the extent it prohibits, without exception, certain incidental contacts with probationers and parolees at church functions, political meetings and the like. Probationers and parolees are a significant percentage of the population, particularly in urban areas. To require MDOC employees to extricate themselves from community events and organizations in which offenders also happen to participate represents a significant intrusion on the employees’ personal liberty. Preventing such incidental contacts with offenders bears only the remotest relation to the preservation of prison security and the avoidance of conflicts of interest. See Turner, 482 U.S. at 89-90, 107 S.Ct. 2254 (holding that the logical connection between the regulation and the asserted goal cannot be “so remote as to render the policy arbitrary or irrational”). Indeed, the evidence submitted by MDOC in support its Work Rule relates to problems with personal relationships between employees and offenders, not to mere contact between them. See note 2, supra. Thus, only when the contact is intentional and repetitive, evolving into a relationship, should MDOC’s penological interests even come into play. The lack of a case-by-case *1051 exception for such incidental contact confirms the lack of a close fit between the Work Rule’s prohibition and the asserted penological interests. See Abbott, 490 U.S. at 412, 109 S.Ct. 1874 (where “the nature of the asserted governmental interest is such as to require a lesser degree of case-by-case discretion, a closer fit between the regulation and the purpose it serves may safely be required”). I would hold that the blanket prohibition against incidental contact with probationers and parolees fails the first prong of the Turner test.
Further, as currently formulated, Work Rule 46 provides that a MDOC employee can be terminated if he or she attends a church event or a political event also attended by probationers or parolees, even if he or she does not know that any of the attendees are on parole or probation. This “strict liability” approach bears no logical relation to the asserted penological interests of preventing MDOC employees from using their positions to compromise prison security or avoiding conflicts of interest. At a minimum, I would limit the prohibition against non-work-related contacts with probationers and parolees to situations where the MDOC employee knew or should have known that he or she had contact with such an offender.
b. Contact with family members of offenders and inmates’ visitors
The more troubling proposition is whether Turner can be interpreted to prohibit contacts or communications with individuals who are not subject to the MDOC’s jurisdiction, but who are family members of such individuals. Such family members are a “limited class” in the strictest sense of the term — i.e., there are a finite number of such individuals; however, the size of the class is significant, in the hundreds of thousands. Moreover, because family members are a diffuse class, they likely are not identifiable to MDOC employees in many cases. A MDOC employee would not know that an individual he or she meets outside of work is a family member of an offender; he or she may not become apprised of this fact if the individual never volunteers it. Yet the MDOC employee’s job is in jeopardy, regardless of what the employee actually knows or should know about the individual’s relationship to an “offender.” Thus, the family member classification does not constitute a “limited class” in the sense that the Turner Court applied the term to a discrete, relatively small and readily-identifiable group (there, prison inmates who were confined in a single location).
The next question is whether prison officials have “particular cause” to be concerned about such family members. In this regard, the MDOC has submitted an affidavit from Robert Steinman, the Deputy Director of the Field Operations Administration, who is responsible for the oversight and operation of adult felony probation and parole services. According to Steinman:
An employee who is involved in other than a professional relationship with a probationer or parolee, or family members of the probationer or parolee, may be persuaded or coerced to misuse his/ her position to benefit the parolee or probationer, and/or friends and family of the parolee or probationer. This concern is not limited only to parole and probation agents. Administrative support staff working in field offices and in Central Office are vulnerable as well, having access to may [sic] types of records which can be tampered or altered. For example, administrative support staff may have access to reports of drug testing results regarding parolees and probationers. The employee could, either willingly or under threat, manipulate data and records to change those reports. Other records could be manipulated to affect a probationer or parol *1052 ee’s record of compliance with special conditions, work reports, payment of restitution, etc. An agent could be coerced into using his/her position to gain access to parolees and probationers who are housed in county jails for violations of parole or probation, and even could affect [sic] the release of an individual from county jail under false pretenses. These are just some examples of improper use of position which can result from non-professional relationships between employees and parolees, probationers, and their families.
(J.A. 217-18) (Steinman Aff. at ¶ 6).
No doubt the MDOC has identified some conceivable harms that a compromised MDOC employee could inflict on the correctional system. Arguably, the risk of at least some of these harms being facilitated by former inmates who strike up relationships with MDOC employees is “self-evident.” Cf. Bazzetta, 539 U.S. at --, 123 S.Ct. at 2168 (MDOC’s regulations “prohibiting visitation by former inmates bears a self-evident connection to the State’s interest in maintaining prison security and preventing future crimes”). But the risk of harm, although conceivable, is not self-evident in the case of family members of offenders and inmates’ visitors, who, as far as anyone knows, are and have always been upstanding citizens. By definition, family members and visitors are not offenders. Unless they have been found guilty of a crime outside of Michigan, family members and visitors have not been “convicted of felonious behavior, which often involves dishonesty, fraud, and coercion.” (J.A. 219) (Steinman Aff. at ¶ 9). Indeed, the MDOC has not cited a single example of a MDOC employee using his or her position to carry out, whether willingly or under duress, any improper favors for family members or visitors. Thus, the MDOC has not based its prohibition against relationships with family members or visitors on “particular cause,” but on “questionable speculation” that such contacts conceivably could threaten prison security. Cf. California First Amendment Coalition v. Woodford, 299 F.3d 868, 880 (9th Cir.2002) (regulation that barred outsiders from witnessing administration of lethal injection was not justified by alleged interest in protecting execution team members from being publicly identified and subjected to retaliation; evidence in the record showed that regulation was an “overreaction, supported only by questionable speculation”); see also Shimer, 100 F.3d at 510 (“We ... are reduced to speculation when not provided with evidence, and, having speculated, find it difficult to establish a connection between the prison administration’s unsubstantiated justifications and its policy of prohibiting correctional employees from contacting the Prisoner Review Board on behalf of prisoners.”).
For these reasons, the former Work Rule’s blanket prohibition on contact with family members of offenders and inmates’ visitors is unconstitutional. Although the revised Work Rule now permits such contacts with prior written approval from the prison authorities, the Rule provides absolutely no standards to guide prison administrators in the exercise of their discretion. I would direct the MDOC to a Federal Bureau of Prisons regulation on visitation by friends and associates which, by analogy, strongly suggests that incorporating specific standards into the MDOC’s family member/visitor exception is feasible. According to that regulation:
The visiting privilege ordinarily will be extended to friends and associates having an established relationship with the inmate prior to confinement, unless such visits could reasonably create a threat to the security and good order of the institution. Exceptions to the prior relationship rule may be made, particularly for inmates without other visitors, when it is shown that the proposed visitor is reli *1053 able and poses no threat to the security or good order of the institution.
28 C.F.R. § 540.44(c). See also Abbott, 490 U.S. at 416, 109 S.Ct. 1874 (“we are comforted by the individualized nature of the determinations required by the regulation” which prohibited a prisoner from receiving a publication only when the warden determined that it was “detrimental to the security, good order, or discipline of the institution or ... might facilitate criminal activity”) (internal quotation marks and citations omitted). Applying a standard like “reasonable threat to security and good order” would serve to focus the MDOC on concrete criteria that specifically relate to its interest in maintaining prison security, making it less likely that the MDOC would render, or create the appearance of, arbitrary determinations that have nothing to do with its penological interests.
To summarize, the revised Work Rule 46 is reasonably related to a legitimate peno-logical interest to the extent it prohibits relationships between MDOC employees and inmates, probationers or parolees, but not to the extent it bars incidental or unknowing contact with such individuals. The Rule is not related to a legitimate penological interest to the extent it (a) prohibits unknowing or incidental contact with family members of offenders or inmates’ visitors and (b) prohibits contact with family members or inmates’ visitors, subject only to a case-by-case exception that fails to take into account prison security, or any other factor.
2. Alternative means of exercising associational rights
When examining prison regulations, “[w]ere it shown that no alternative means of communication existed, though it would not be conclusive, it would be some evidence that the regulations were unreasonable.” Bazzetta, 539 U.S. at -, 123 S.Ct. at 2169. Here, Plaintiff Loranger complains that Work Rule 46 prevents her from visiting with Rebecca Contreras, her closest friend for the past 15 years, because Contreras’ son is on probation. Likewise, the Rule has prevented Contreras from participating in Loranger’s childbirth, attending the baptism of Loranger’s child and actively serving as the Godmother of Loranger’s child. Although Loran-ger requested permission to have contact with Contreras, the MDOC denied her request. Plaintiffs also complain generally that the Rule prohibits MDOC employees from attending Alcoholics Anonymous meetings, political campaign meetings, religious services and PTA meetings, when any attendees at those meetings are on parole or probation.
Alternative means of participation in these associational activities exist only if Plaintiffs leave their employment with the MDOC (an alternative the majority cavalierly calls a “simple expedient”). But because the challenged prison regulations are unreasonable, Plaintiffs are not required to quit their jobs to enjoy these rights. Compare Keeney, 57 F.3d at 581-82 (holding that prison work rule that forbade social involvement with inmates did not impermissibly burden prison guard’s right to marry by forcing her to quit in order to marry an inmate; regulation served “plausible” concerns of prison in avoiding conflicts of interest and the appearance of favoritism). Rather, the question is whether, as MDOC employees, Plaintiffs have alternative means of carrying out their otherwise-protected associational activities without fear of being terminated. Clearly, they do not. They are absolutely prohibited from engaging in any associational activities that result in incidental or unknowing contact with probationers and parolees. Additionally, subject only to the unfettered discretion of prison officials, MDOC employees are prohibited from contact with offenders’ family members and inmates’ visitors, with whom they *1054 may have had long-standing, pre-existing personal relationships.
3. Impact of accommodation on prisoners, guards and resources
Any alternative to the MDOC regulations must avoid a “significant reallocation of the prison system’s financial resources [that] would impair the ability of corrections officers to protect all who are inside a prison’s walls.” Bazzetta, 539 U.S. at -, 123 S.Ct. at 2169. Only when the proposed alternative “will have a significant ‘ripple effect’ on fellow inmates or on prison staff, [should courts] be particularly deferential to the informed discretion of corrections officials.” Turner, 482 U.S. at 90, 107 S.Ct. 2254 (citation omitted).
It appears that there would little, if any, reallocation of prison resources if this Court were to require the MDOC to create an exception for unknowing or incidental contact with probationers and parolees. The MDOC already has adopted a case-by-case exception procedure for contacts with family members of offenders and inmates’ visitors, which by all estimates, constitute a far greater population than the probationer/parolee population. There is no indication in the record that the adoption of this exception would result in a crush of requests from MDOC employees. As noted above, there is no evidence that such incidental or unknowing contacts would pose a threat to prison security.
Furthermore, there would be no effect on prison resources as a result of requiring the MDOC to apply specific standards to its current policy of granting case-by-case exceptions to the prohibition against contact with offenders’ family members and with inmates’ visitors. In fact, the MDOC is likely to save resources by following-uniform standards that do not have to be re-invented each time a request is submitted. In addition, by incorporating the concept of prison security into the standards, the MDOC’s legitimate penological interests would be advanced.
4. Ready alternatives to the regulations
The “existence of obvious, easy alternatives [to prison regulations] may be evidence that the regulation is not reasonable, but is an ‘exaggerated response’ to prison concerns.” Turner, 482 U.S. at 90, 107 S.Ct. 2254. Although this factor is not a “least-restrictive-means” test, id., prison regulations are unreasonable if there is “some obvious regulatory alternative that fully accommodates the asserted right while not imposing more than a de minim-is cost to the valid penological goal.” Bazzetta, 539 U.S. 126, 123 S.Ct. 2162, 156 L.Ed.2d 162 (citing Turner, 482 U.S. at 90-91, 107 S.Ct. 2254).
As discussed in the preceding section, there are obvious regulatory alternatives that fully accommodate the MDOC’s interest in preserving prison security and avoiding conflicts of interest in the context of contacts with parolees, probationers, family members of offenders and visitors. The creation of an exception for incidental or unknowing contact with parolees and probationers, as well as the institution of specific standards for contacts with family members of offenders and visitors would impose a de minimis, if any, cost on the MDOC; even under the present version of Work Rule 46, the MDOC is incurring the cost of case-by-case determinations about the permissibility of contacts with family members and visitors. Without these common-sense modifications, Work Rule 46 is an exaggerated — indeed, ridiculous'— response to the MDOC’s legitimate concern over maintenance of prison security.
Based on the foregoing, I concur that the grant of summary judgment to the MDOC on Plaintiff Akers’ and Plaintiff Loranger’s claims was appropriate. It is *1055 undisputed that both Akers and Loranger had purposeful contacts with a parolee in violation of former Work Rule 24 (Akers) or with an inmate in violation of former Work Rule 12 (Loranger). Thus, disciplinary action against them did not violate their constitutional right to freedom of association. Nevertheless, Plaintiff Loran-ger and Plaintiff UAW Local 6000 are entitled to a declaration that the revised Work Rule 46 is unconstitutional to the extent it imposes discipline for: (1) unknowing or incidental contact with offenders, family members of offenders or inmates’ visitors or (2) contact with family members of offenders or inmates’ visitors, subject only to a standardless exception process.
III.
QUALIFIED IMMUNITY
Since neither Akers nor Loranger suffered a constitutional harm stemming from their discipline for violating the Work Rules, the individual Defendants are entitled to qualified immunity. See Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) (“If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity.”). Regardless, there appears to be no basis to find that the right of prison employees to engage in particular associational activities with probationers or parolees was “clearly established,” id., given the dearth of case law applying the four-part Turner test to the regulation of employment conditions in a prison setting. Accordingly, I concur with the majority’s judgment that Defendants were entitled to qualified immunity to the extent they were sued in their individual capacities.[3]
IV.
CONCLUSION
For the foregoing reasons, I CONCUR that the district court properly granted summary judgment on Plaintiff Akers’ and Loranger’s claims for unconstitutional discipline. I also CONCUR in the majority’s judgment that the individual Defendants are entitled to qualified immunity. I DISSENT to the extent the district court should have granted Plaintiff Loranger and UAW Local 6000’s request for prospective relief regarding certain aspects of Work Rule 46. Work Rule 46 legitimately bars non-work-related relationships between MDOC employees and offenders, but the prohibition against all non-work-related contact with probationers and parolees should be limited to situations where the MDOC employee knew or should have known that such individuals were offenders. The prohibition also should contain an exception for incidental contact with such offenders. Work Rule 46 also is unconstitutional to the extent it bars (a) any unknowing or incidental contact with family members of offenders or inmates’ visitors and (b) permits such contacts, subject only to the MDOC’s unfettered discretion to make exceptions with *1056 out reference to any factors related to prison security, order or discipline.

. Like its predecessor, Work Rule 24 also prohibited the MDOC employee from living with or providing lodging for a prisoner, probationer or a parolee, except for the employee’s parents or children or where the employee’s marriage to the offender existed prior to the employment date or where the spouse became an offender after the employment date. Work Rule 46, which superseded Work Rule 24, relaxed this prohibition by permitting lodging for a sibling. The plaintiffs do not challenge this portion of the Work Rule.

. See also (J.A. 319) (Affidavit of Richard E. Johnson, Assistant Deputy Director of the Correctional Facilities Administration at, ¶ 11) (“I am aware of several examples of employees who have smuggled contraband into a facility due to the development of a personal relationship with a prisoner....”); (J.A. 223) (Affidavit of Dan L. Bolden, Deputy Director of the Correctional Facilities Administration, at ¶ 8) ("Employees who become involved in [personal] relationships with prisoners are at risk to become involved, often against their will, in bringing contraband into the prison, including money, drugs, and weapons, and assisting in escape plans, plans to create disturbances, or plots to retaliate against staff and other prisoners.”); J.A. 217 (Affidavit of Robert Stein-man, Deputy Director of the MDOC’s Field Operations Administration, at ¶ 5) ("Any appearance of impropriety on the part of the [parole or probation] agent can compromise the employee’s authority and control over the probationer and parolee and can result in serious ramifications, ranging from lax and inadequate supervision to actual falsifying of reports and information regarding the individual being supervised.”)

. I do take issue with the majority's statement that Defendants are entitled to qualified immunity because “a United States District Court Judge, given the benefit of decades of legal training and practice, years of hearings and adversarial briefings by able counsel, was unable to find ... a violation.” With all due respect, my brethren in the district courts have been known to commit legal error, including plain error through the failure to cite and apply clearly established legal precedent. If a district judge's opinion of the state of the law were somehow dispositive of the qualified immunity issue, the Courts of Appeals rarely would have occasion to reverse a district judge's ruling on qualified immunity. Thus, whether a district judge failed to find a constitutional violation should not control this Court's analysis of the issue.