RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0419P (6th Cir.)
File Name: 03a0419p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

DAWN AKERS; KIM
LARANGER, UNITED
AUTOMOBILE, AEROSPACE,
AND AGRICULTURAL
IMPLEMENT WORKERS OF
AMERICA, LOCAL 6000; AKUA
MITCHELL-DAVIS,
　　　　*Plaintiffs-Appellants,*

　　　　*v.*

KENNETH MCGINNIS; ROBERT
STEINMAN; MARSHA
FORESMAN; PATRICIA
CARUSO; JOHN MARSHALL;
EDWARD HAGGERTY;
GEORGE MARRA; WILLIAM
OVERTON; RUTH BARE;
FRANK EISENHAUER; JOSEPH
JERECKOS; JOHN MAKOWSKI;
TERRY PITCHER; KIRK
MCVITTIE; GWEN RODGERS,
in their Personal and Official
Capacities, Jointly and
Severally,
　　　　*Defendants-Appellees.*

> No. 01-1383

Appeal from the United States District Court
for the Western District of Michigan at Marquette.
No. 97-00325—Gordon J. Quist, District Judge.

Argued: October 15, 2002

Decided and Filed: December 1, 2003

Before: BOGGS, Chief Judge; and SUHRHEINRICH and
CLAY, Circuit Judges.

———————————

#### COUNSEL

**ARGUED:** Miranda K.S. Massie, SCHEFF &
WASHINGTON, Detroit, Michigan, for Appellants. John L.
Thurber, OFFICE OF THE ATTORNEY GENERAL,
CORRECTIONS DIVISION, Lansing, Michigan, for
Appellees. **ON BRIEF:** Miranda K.S. Massie, SCHEFF &
WASHINGTON, Detroit, Michigan, for Appellants. John L.
Thurber, OFFICE OF THE ATTORNEY GENERAL,
CORRECTIONS DIVISION, Lansing, Michigan, for
Appellees. Michael J. Steinberg, AMERICAN CIVIL
LIBERTIES UNION FUND OF MICHIGAN, Detroit,
Michigan, for Amicus Curiae.

　BOGGS, C. J., delivered the opinion of the court, in which
SUHRHEINRICH, J., joined. CLAY, J. (pp. 23-43),
delivered a separate opinion concurring in part and dissenting
in part.

———————————

**OPINION**

———————————

BOGGS, Chief Judge.  Plaintiffs, Dawn Akers and Kim Loranger, a current and a former employee of the Michigan Department of Corrections ("MDOC"), and their union, the United Automobile, Aerospace, and Agricultural Implement Workers of America, Local 6000 ("UAW"), appeal the district court's summary judgment for the defendants, Kenneth McGinnis, the director of the MDOC, and numerous other listed MDOC administrators.  The plaintiffs had sued on the grounds that an MDOC rule ("Rule") that barred all MDOC employees from any non-work-related contact with prisoners, parolees, probationers ("offenders"), their relatives and visitors, violated their "clearly established rights to privacy, association, and due process guaranteed by the First, Third, Fourth, Fifth, Ninth, and Fourteenth Amendment to the United States Constitution."  Specifically, the plaintiffs sought reinstatement after discharge for violating the Rule, expungement from the plaintiffs' disciplinary records of any reference to a violation of the Rule, and compensatory and punitive damages.  On cross-motions for summary judgment, the district court held that the Rule was constitutional and that the defendants enjoyed qualified immunity.  Plaintiffs now appeal the holdings that the Rule was not contrary to the freedom of association guaranteed by the First and Fourteenth Amendments and that the defendants enjoyed qualified immunity.  We affirm.

**I**

At all times relevant to this litigation, the MDOC has had a Rule barring employees from "Improper Relationships with Prisoners, Parolees or Probationers, Visitors or Families." This Rule, originally known as Rule 12, strictly prohibited "improper or overly familiar conduct with [offenders] or their family members or visitors."  Violations of the Rule

"subject[ed] an employee to disciplinary action up to and including dismissal[]."  A non-exhaustive list of improper actions included "exchange of letters, money or items, . . . cohabitation [except in case of a pre-existing marriage], being at the home of [an offender] for reasons other than an *official* visit without reporting the visit, . . . giving [offender] [employee's] home telephone number, [and] sexual contact of any nature." (emphasis in original).  Furthermore, the Rule required reporting of "[a]ny contact made with [an offender], or their family member(s), outside the regular performance of an employee's job."  In June 1996, Rule 12 was repromulgated as Rule 24.  In September 1999, during the course of this litigation, Rule 24 was replaced by a substantially identical Rule 46.  Finally, in April 2000, Rule 46 was revised to clarify the definitions of family member and visitor and recognize the power of the MDOC to grant individual employees limited exemptions to the Rule.  To receive such an exemption allowing contact with offenders' visitors or family members, but not offenders themselves, an employee would have to submit a misleadingly titled "Offender Contact Exception Request" form and await approval from the Director of the MDOC or a designee. From the creation of the exception procedure to July 23, 2001, 226 such exceptions had been sought and of these 223 had been granted.

Plaintiff Loranger, then a Wayne County probation officer, was contacted by a man she had dated before becoming an MDOC employee and who was then serving a life sentence without parole in a prison outside her jurisdiction.  She exchanged several letters with him.  When Loranger realized that she was in violation of the Rule, she approached her supervisor about the matter.  Four months later, she was terminated for her Rule violation.  Plaintiff Akers, while a bookkeeper at a correctional facility in Chippewa County, had befriended a prisoner clerk.  Shortly after the prisoner's release, Akers gave him a ride in her car to a job interview. For this violation of the Rule, she also was terminated by the MDOC.  Both women had previously been positively

evaluated by their supervisors and in neither case is there an allegation that their specific conduct had adversely affected the MDOC's function. Plaintiff UAW represents about two thousand clerical and professional employees of the MDOC, among them Loranger and Akers. UAW does not represent any prison guards.

In March 1997, the plaintiffs filed a complaint in the United States District Court for the Western District of Michigan and the case was assigned to a magistrate judge. During the following months, labor arbitrators set aside the discharges of both Loranger and Akers and instead imposed relatively brief suspensions on both women. As the plaintiffs had also sought the purging of their disciplinary record of any reference to the Rule violation as well as monetary damages, their reinstatement did not moot the action. After her reinstatement and during the pendency of the case, Loranger repeatedly sought permission to have contact with Rebecca Contreras, a long-standing friend whose son had been placed on probation, and was repeatedly denied. When Loranger became pregnant and wished Contreras to be her child's godmother, she sought and was granted a preliminary injunction ordering the MDOC to allow Loranger to invite Contreras to her child's baptism. Loranger also continued to request permission to have contact with Stacey Artley, a young woman to whom Loranger was a "Big Sister" and who then was on probation. Akers, during the pendency of this action, transferred to a position with the Michigan Department of Natural Resources, mooting her claims for prospective relief. On cross-motions for summary judgement, the magistrate judge issued a report and recommendation, which proposed finding the original Rule to be unconstitutional under the First and Fourteenth Amendments, expunging Akers's and Loranger's disciplinary record, and declaring moot the challenge to the current version of the Rule. However, the district court rejected the report and recommendation and found that there was a live controversy regarding both the current and the old version of the Rule, but also that all versions of the Rule were constitutional, and therefore granted summary judgement to

MDOC and qualified immunity to the individual named defendants. Here the plaintiffs appeal this grant of summary judgment and qualified immunity.

## II

The MDOC contends that any challenges to the previous versions of the Rule were mooted when it adopted its current version. However, a "defendant's voluntary cessation of allegedly unlawful conduct ordinarily does not suffice to moot a case." *Jones v. City of Lakeland*, 224 F.3d 518, 529 (6th Cir. 2000) (en banc) (quoting *Friends of the Earth v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 174 (2000)). "A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Jones*, 224 F.3d at 529 (quoting *United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203 (1968)). "The 'heavy burden of persua[ding]' the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness." *Jones*, 224 F.3d at 529 (quoting *Laidlaw*, 528 U.S. at 170). In the present case, as the promulgation of work rules appears to be solely within the discretion of the MDOC, there is no guarantee that MDOC will not change back to its older, stricter Rule as soon as this action terminates. Moreover, as the plaintiffs could be entitled to money damages and the purging of their disciplinary records if the old version of the Rule were found to be unconstitutional even if the current version was constitutional, the issue is not moot and it is incumbent on this court to examine all versions of the Rule. We begin by analyzing the original version of the Rule without the exception procedure.

The plaintiff's claims of constitutional violation are based upon two analytically distinct forms of freedom of association: freedom of intimate association, protected under the Substantive Due Process component of the Fourteenth Amendment, and freedom of expressive association, protected

under the Freedom of Speech Clause of the First Amendment. *See Roberts v. United States Jaycees*, 468 U.S. 609, 617-18 (1984). With respect to intimate association, "the Court has concluded that choices to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme. In this respect, freedom of association receives protection as a fundamental element of personal liberty." *Ibid.* With respect to expressive association, "the Court has recognized a right to associate for the purpose of engaging in those activities protected by the First Amendment–speech, assembly, petition for the redress of grievances, and the exercise of religion. The Constitution guarantees freedom of association of this kind as an indispensable means of preserving other individual liberties." *Id.* at 618. As "the nature and degree of constitutional protection afforded freedom of association may vary depending on the extent to which one or the other aspect of the constitutionally protected liberty is at stake in a given case," it is necessary to examine the Rule as a potential infringement of both intimate association and expressive association. *Ibid.*

### A

State employees' freedom of expressive association claims are analyzed under the same standard as state employees' freedom of speech claims. *See Boals v. Gray*, 775 F.2d 686, 692 (6th Cir. 1985). "Because the analytic tools for adjudicating First Amendment retaliation claims under the Free Speech Clause have been so extensively developed, courts in this and other circuits have tended to import fully that reasoning when litigants have characterized their claims as arising under another First Amendment clause." *Thaddeus-X v. Blatter*, 175 F.3d 378, 390 (6th Cir. 1999) (en banc). The contours of state employees' freedom of speech in turn are defined by two leading Supreme Court precedents.

In *Pickering v. Board of Education*, 391 U.S. 563 (1968), the Supreme Court denied that government employees "may constitutionally be compelled to relinquish the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest in connection with the operation of the [institution] in which they work." *Id.* at 568. But while the Court has long rejected Holmes's famous dictum on the free speech right of government employees,[1] it also concluded "that the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general. The problem in any case is to arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Ibid.*

In *Connick v. Myers*, 461 U.S. 138 (1983), the Court further amplified on this issue.

When employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment. Perhaps the government employer's dismissal of the worker may not be fair, but ordinary dismissals from government service which violate no fixed tenure or applicable statute or regulation are not subject to judicial review even if the reasons for the dismissal are alleged to be mistaken or unreasonable.

---

[1] A policeman "may have a constitutional right to talk politics, but he has no constitutional right to be a policeman." *McAuliffe v. City of New Bedford*, 29 N.E. 517, 517 (Mass. 1892) (Holmes, J.).

*Id.* at 146. In general, and outside the area of issues of public concern, the First Amendment provides no greater protection against discipline or discharge to government employees than it does to private employees:

[W]hen a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior. . . . Our responsibility is to ensure that citizens are not deprived of fundamental rights by virtue of working for the government; this does not require a grant of immunity for employee grievances not afforded by the First Amendment to those who do not work for the state.

*Id.* at 147. Moreover, the Court cautioned against an overly broad construction of the ambit of the public concern:

To presume that all matters which transpire within a government office are of public concern would mean that virtually every remark–and certainly every criticism directed at a public official–would plant the seed of a constitutional case. While as a matter of good judgment, public officials should be receptive to constructive criticism offered by their employees, the First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs.

*Id.* at 149.

In *Pickering* and *Connick*, the Supreme Court created a test containing two levels of scrutiny.[2] Restraints on government employee speech, or, as in the present case, government employee association, touching on a matter of public concern must meet the *Pickering* test balancing between the interests of the employee and the interests of the state. We have characterized this test as a "form of intermediate scrutiny." *Montgomery v. Carr*, 101 F.3d 1117, 1129 n.7 (6th Cir. 1996). Restraints on government employee speech, or government employee association, not touching on a matter of public concern, are subject merely to rational basis scrutiny. In either case, it is the court's task to apply the test to the facts. *See Waters v. Churchill*, 511 U.S. 661, 671 (1994). This bifurcated test remains the law. The Supreme Court's most recent extensive disquisition on this subject, while providing further instruction on the proper balancing of governmental interests and the interest of government employees to speak on matters of public concern, adopts without further elaboration the *Pickering/Connick* distinction between matters that are of public concern and those which are not. *United States v. Nat'l Treasury Employees Union*, 513 U.S. 454, 465-66 (1995).

The question of what speech or association touches on a matter of public concern is by necessity a question for case-by-case adjudication. *See Dambrot v. Cent. Mich. Univ.*, 55 F.3d 1177, 1186 n.8 (6th Cir. 1995) (collecting Sixth Circuit precedent concerning what speech is a matter of public concern).

---

[2]Plaintiffs also cite some older Supreme Court precedents containing broad and aspirational language regarding the Free Speech rights of public employees. *See, e.g., Shelton v. Tucker*, 364 U.S. 479, 488 (1960); *United States v. Robel*, 389 U.S. 258, 265-66 (1967); *Keyishian v. Bd. of Regents*, 385 U.S. 589 (1967). As these cases cover the same ground as the more recent and specific Supreme Court precedents relied upon herein, we need not here decide the older cases' present vitality.

In general, a matter of public concern is a matter of political, social, or other concern to the community. It is important, however, to distinguish matters of public concern from internal office politics. Federal courts normally do not review personnel decisions reacting to an employee's behavior when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters of only personal interest. The mere fact that public monies and government efficiency are related to the subject of a public employee's speech does not, by itself, qualify that speech as being addressed to a matter of public concern. If the speech is not related to a matter of public concern, we do not evaluate the reasons for the decision.

*Jackson v. Leighton*, 168 F.3d 903, 909-10 (6th Cir. 1999) (internal citations, alterations, and quotation marks omitted). "To determine whether the speech involves a matter of public concern, we look to the content, form, and context of the statements in light of the record as a whole." *Id.* at 910. "Furthermore, the court must determine the point of the speech in question . . . because controversial parts of speech advancing only private interests do not necessarily invoke First Amendment protection." *Hardy v. Jefferson Cmty. Coll.*, 260 F.3d 671, 678 (6th Cir. 2001) (internal quotation marks, alterations, and citations omitted). The Supreme Court has indicated that the "question of whether expression is of a kind that is of legitimate concern to the public is also the standard in determining whether a common-law action for invasion of privacy is present." *Connick*, 461 U.S. at 143 n.5. Few indicia of speech are dispositive. "[A]n employee's speech, activity or association, merely because it is union-related, does not touch on a matter of public concern as a matter of law." *Boals*, 775 F.2d at 693. Nor are statements made privately necessarily outside the reach of the public concern rule. *Givhan v. W. Line Consol. Sch. Dist.*, 439 U.S. 410, 414 (1979). However, government employees' speeches and articles that "ha[d] nothing to do with their jobs and [did] not even arguably have any adverse impact on the efficiency

of the offices in which they work," but were made to *public audiences* are deemed to touch on matters of public concern. *Nat'l Treasury Employees Union*, 513 U.S. at 465-66.

Almost all conceivable association affected by the Rule and all association alleged to have been discouraged by the Rule do not touch on matters of public concern. Loranger wishes to have contacts with an old friend and her "Little Sister." Akers wishes to assist a probationer whom she befriended. While all of these impulses are entirely understandable, even laudable, they are purely private matters of little or no concern to the community as a whole. The plaintiffs also envision hypothetical situations in which they are prevented from contacting a union official who is also related to an offender. But even such hypothetical situations do not rise to the level of public concern because mere individual labor grievances are not matters of public concern. *See, e.g.*, *Connick*, 461 U.S. at 154; *Boals*, 775 F.2d at 693.

Plaintiffs come closest to alleging interference with an association touching on the public concern when asserting their right to contact a political party official who was also the uncle of an offender. If such association is made for a purpose such as campaigning for public office, it would arguably touch on a matter of public concern. However, a separate line of cases has upheld against constitutional challenge governmental restrictions on public employees' partisan political activities:

Congress had, and has, the power to prevent [government employees] from holding a party office, working at the polls, and acting as party paymaster for other party workers. An Act of Congress going no farther would in our view unquestionably be valid. So would it be if, in plain and understandable language, the statute forbade activities such as organizing a political party or club; actively participating in fund-raising activities for a partisan candidate or political party; becoming a partisan candidate for, or campaigning for, an elective public

office; actively managing the campaign of a partisan candidate for public office; initiating or circulating a partisan nominating petition or soliciting votes for a partisan candidate for public office; or serving as a delegate, alternate or proxy to a political party convention. Our judgment is that neither the First Amendment nor any other provision of the Constitution invalidates a law barring this kind of partisan political conduct by federal employees.

*United States Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers*, 413 U.S. 548, 556 (1973); *see also Carver v. Dennis*, 104 F.3d 847, 853 (6th Cir. 1997) (finding no violation of associational or free speech rights when county clerk terminated subordinate who decided to run for the same office). Thus, the actual associations denied to the plaintiffs, as well as hypothetical associations suggested in the plaintiffs' briefs, either do not touch on a matter of public concern, or may be otherwise restrained.

The MDOC easily meets the rational basis test for the non-public association restrained by the Rule.[3] The MDOC has a legitimate interest in preventing fraternization between its employees and offenders and their families. Given the proven willingness of offenders to break the law, often violently, to reach their ends, on the one hand, and the near-plenary power over offenders entrusted to MDOC employees, on the other,

---

[3]The plaintiffs complain that the MDOC has not here laid out a carefully reasoned defense of the interest underlying the Rule and the relationship between these interests and the Rule. However, under rational basis review, a "proffered explanation for the statute need not be supported by an exquisite evidentiary record; rather we will be satisfied with the government's 'rational speculation' linking the regulation to a legitimate purpose, even 'unsupported by evidence or empirical data.'" *Craigmiles v. Giles*, 312 F.3d 220, 224 (6th Cir. 2002) (quoting *FCC v. Beach Communications*, 508 U.S. 307, 313 (1993)). The burden is on those who challenge the statute to "negative every conceivable basis that might support it." *Craigmiles*, 312 F.3d at 224 (quoting *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973)).

the potential for exploitation of vulnerable offenders by MDOC employees, or vulnerable MDOC employees by offenders, needs no elaboration. The MDOC's interest in preventing such exploitation is only somewhat attenuated in cases where the employee has no direct supervisory authority over the offender. Even clerical workers without any penal authority can by the mere manipulation of paperwork greatly affect an offender's status for better or worse, or at least be pressured into attempting to do so. The inclusion of offenders' visitors and families into the class with whom contact is forbidden may be necessary to prevent the use of third parties to circumvent the ban on direct contact and influence. The MDOC's interest is clearly legitimate, and the Rule is a rational means for advancing the interest. Therefore, the Rule withstands challenge on the basis of freedom of expressive association.[4]

**B**

The plaintiffs also claim that the Rule interfered with their personal friendships. Personal friendship is protected as an intimate association. *Corrigan v. City of Newaygo*, 55 F.3d 1211, 1214-15 (6th Cir. 1995). This court explicated the appropriate level of scrutiny for restraints on the freedom of intimate association in *Montgomery*.[5] In that case, we considered a challenge, as contrary the freedom of intimate

---

[4]This conclusion is also in agreement with the only decision of a sister circuit examining similar polices, even under a heightened standard. *Ross v. Clayton County*, 173 F.3d 1305, 1310-11 (11th Cir. 1999) (upholding, under *Pickering* balancing test stipulated to by the parties, Georgia Department of Corrections regulation prohibiting contact between its employees and offenders).

[5]The plaintiffs object to the application of *Montgomery*, characterizing it as a mere anti-nepotism case. However, given that *Montgomery* concerns a restraint on the same freedom of intimate association at issue here, relies to a large extent on the same case law as used by the plaintiffs, and in its reasoning does not depend on the specific features of the anti-nepotism rules, it is a highly relevant precedent.

association, to a school district's rule that barred employees at the same school from marrying. 101 F.3d at 1117-21. We held that a "direct and substantial interference" with intimate association was subject to strict scrutiny, while lesser interferences merely merited rational-basis review. *Id.* at 1124 (citing *Zablocki v. Redhail*, 434 U.S. 374, 383-84 (1978)).

The contours of a direct and substantial interference with intimate association are illustrated by the case law. A total ban on marriage outside one's ethnic group is a direct and substantial interference. *Loving v. Virginia*, 388 U.S. 1 (1967). So is a requirement on non-custodial parents to obtain court permission before any remarriage. *Zablocki*, 434 U.S. at 387. However, termination of Social Security benefits for a disabled dependent child who marries someone ineligible for benefits is not. *Califano v. Jobst*, 434 U.S. 47, 58 (1977). Nor is a Department of Agriculture regulation that treats husband and wife as one person for purposes of calculating farm subsidies, *Women Involved in Farm Econs. v. United States Dep't of Agric.*, 876 F.2d 994, 1004 (D.C. Cir. 1989), the Internal Revenue Code's marriage penalty, *Druker v. Comm'r*, 697 F.2d 46, 50 (2d Cir. 1982), requiring a citizen-alien couple to fill out a form and submit to an INS interview, *Aguila-Cisneros v. I.N.S.*, No. 99-3963, 2001 WL 223969, at *2 (6th Cir. Feb. 27, 2001), or termination from employment of a municipal employee who marries another municipal employee, *Vaughn v. Lawrenceburg Power Sys.*, 269 F.3d 703 (6th Cir. 2001). From this line of cases, we have abstracted a general rule that we will find "direct and substantial burdens only where a large portion of those affected by the rule are absolutely or largely prevented from marrying, or where those affected by the rule are absolutely or largely prevented from marrying a large portion of the otherwise eligible population of spouses." *Vaughn*, 269 F.3d at 710 (6th Cir. 2001) (citing *Montgomery*, 101 F.3d at 1124-25).

Under these precedents, the Rule is subject only to rational basis review, which–as we explained already–it passes. It does not prevent a large portion of MDOC employees from forming intimate associations; all MDOC employees continue to enjoy the ability to form intimate associations–just not with offenders. Nor are those affected by the Rule absolutely or largely prevented from forming intimate associations with a large portion of the otherwise eligible population. While the plaintiffs stress the large offender population in Michigan, it is only a little over 1% of the state's population. Even if the number of visitors and family members should exceed the number of offenders ten-fold, surely a generous estimate, MDOC employees would only be barred from intimate association with about 10% of the state's population (whereof 9% are subject to routinely-granted exemption under the current Rule). This is far from the absolute bar against marrying a majority of the jurisdiction's population said in *Loving* to be a direct and substantial interference. Moreover, while the bar in *Loving* was absolute, the simple expedient of transferring to another part of the state government or taking employment in the private sector is available to MDOC employees here. In fact, one of the named plaintiffs in this case undertook that step. While a transfer is undoubtedly an inconvenience, it was not found to be a direct and substantial interference in *Montgomery*, nor was even a more serious employment consequence, termination, found to be such an interference in *Vaughn*.

Amicus curiae American Civil Liberties Union argues that the Rule violates the constitutionally protected freedom of association, not merely of MDOC employees, but also of those not employed by the MDOC, such as family members and visitors of offenders, who would associate with employees but for the Rule. Initially, we recognize that First Amendment "protection afforded is to the communication, to its source and to its recipients both." *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council*, 425 U.S. 748, 756 (1976). To the extent amicus suggests that the Rule should therefore be judged not by the relatively lenient

standard for the government-as-employer's interference with private association, but by the more rigorous standard for the government-as-sovereign's interference with private association, it flies in the face of the Supreme Court's and this court's precedent. Any association by definition involves two or more parties and restraining one party from associating will by necessity result in a concomitant effect on the other parties. In this regard, the association between MDOC employees and offenders, their family members, and visitors is no different than almost all other restrictions on association by government employees. Nothing in our precedents indicates that the government only has enhanced authority to regulate association between governmental employees or others over whom it has enhanced authority. To the contrary, to hold as amicus suggest would eviscerate the rule that "Congress may impose restraints on the job-related speech of public employees that would be plainly unconstitutional if applied to the public at large." *Nat'l Treasury Employees Union*, 513 U.S. at 465. *Virginia State Board* is not to the contrary because "[f]reedom of speech presupposes a willing speaker" and the constitutional protections only become effective "where [such] a speaker exists." 425 U.S. at 756. Here, the government merely conditions employment on an employee's agreement not to become a willing speaker to or associate with a limited class of persons. The standard of review of such restrictions on employees is the one of *Pickering*, *Connick*, and their progeny.

As there is no dispute that the revised Rule is more lenient than the original Rule, which we upheld above, there is no need to decide whether the Rule is saved by the exemption procedure grafted onto it. If the older Rule is constitutional, *a fortiori* so is the revised Rule. The plaintiffs object to the exemption procedure on the grounds that exemptions are granted purely at the standardless discretion of the MDOC. As we agree with the court below that the Rule was constitutional even in the absence of an exemption procedure, we need not address this issue. However, we note that even were we to conclude that the exemption procedure was

necessary to sustain the Rule, this argument would not avail plaintiffs. A discretionary exemption procedure can doom a statute subject to enhanced review under the First Amendment. *See, e.g.*, *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 130-31 (1992) (striking down county ordinance giving discretion to administrator in awarding of parade permits); *City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 757 (1988) (striking down city ordinance granting mayor unbridled discretion to permit or prohibit distribution of private newspapers at public news racks); *Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 962 n.12 (1984) (striking down statute granting discretion to secretary of state to waive limits on charitable fund-raising expenses); *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 150-51 (1969) (striking down city ordinance granting broad discretion to commission to grant or deny parade permits). Here, however, we subject a regulation to rational-basis review. A discretionary exemption procedure unable to meet the higher standard of review can still meet this highly-deferential one.

Because the Rule is constitutional, the individual defendants enjoyed qualified immunity. "In civil suits for money damages, government officials are entitled to qualified immunity for discretionary acts that do 'not violate clearly established [federal] statutory or constitutional rights of which a reasonable person would have known.'" *Goad v. Mitchell*, 297 F.3d 497, 501 (6th Cir. 2002) (quoting *Anderson v. Creighton*, 483 U.S. 635, 638-39 (1987), and *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "To determine if qualified immunity attaches, the Supreme Court has delineated a two-part, sequential analysis." *Goad*, 297 F.3d at 501 (citing *Saucier v. Katz*, 533 U.S. 194, 200-01 (2001)). "First, we inquire whether, '[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?'" *Goad*, 297 F.3d at 501 (quoting *Saucier*, 533 U.S. at 201). "If no constitutional right would have been violated were the allegations established, there is no necessity for further

inquiries concerning qualified immunity." *Saucier*, 533 U.S. at 201. Having found no constitutional violation, we must answer the qualified immunity question in the affirmative.

While this disposes of this question, we note that for a plaintiff to defeat a defense of qualified immunity, he must not only prove the violation of a right, but of a *clearly established* right. *Harlow*, 457 U.S. at 818. Indeed, the right must be "so clearly established when the acts were committed that *any* officer in the defendant's position, measured objectively, would have clearly understood that he was under an affirmative duty to have refrained from such conduct." *Dominque v. Telb*, 831 F.2d 673, 676 (6th Cir. 1987) (emphasis added). *See also McCloud v. Testa*, 97 F.3d 1536, 1542 (6th Cir. 1996) (holding that "individual capacity defendants in § 1983 cases receive some benefit from legal doubt about the clarity of existing law."). However, in the present case the district judge found no violation of a constitutional right at all. Thus, for the plaintiffs to prevail here on the question of qualified immunity, the situation would have to be such that *any MDOC official* when promulgating the Rule would be aware of the fact that it violated the Constitution, but a United States district judge, given the benefit of decades of legal training and practice, years of hearings and adversarial briefings by able counsel, was unable to find such a violation. While such a situation is not logically impossible, and doubtless has occurred from time to time, it certainly must be a very rare one, implicitly casting some doubt on the minimum competency of such a trial judge. Therefore, in cases such as this, unless counsel are prepared to contend that such an extreme and unusual situation occurred, they will not be able to succeed in reversing a grant of qualified immunity.

## C

The separate opinion concurring in part and dissenting in part, in contrast to this opinion, the trial court opinions, and all party and amici briefs, analyzes the Rule under the framework of *Turner v. Safley,* 482 U.S. 78 (1987). Under *Turner*, "a *prison regulation* imping[ing] on *inmates'* constitutional rights" will be upheld "if it is reasonably related to legitimate penological interests." *Id.* at 89 (emphases added).

Under the First and Fourteenth Amendments, associational rights of the general population enjoy the highest level of legal protection against state regulation. However, the state enjoys enhanced powers to regulate association by certain groups. Two such regulable groups are involved here: prisoners, under *Turner* and its progeny, and state employees, under *Pickering* and its progeny. Moreover, the exercise of associational rights by definition involves more than one party and to regulate one party to an association impinges upon the interests of the other parties. Therefore, the enhanced regulatory power over some groups implies by necessity a power to impinge upon the interests of those who would associate with members of the regulable groups.

The present case concerns an employment regulation affecting association between MDOC employees and a large class of persons, most of whom are not prisoners and over the majority of whom, the relatives and visitors of offenders, the state enjoys *no* enhanced regulatory power. Therefore, in general there is no prisoner nexus, but there always is an employment nexus. As the state's regulatory power springs from the employment nexus, the proper analytical framework is *Pickering*, not *Turner*. Even as far as the Rule is applied against associations between MDOC employees and prisoners, the regulation is valid if it is within the state's

power either as an employer or a warden.[6] As we conclude that the state's power as an employer is sufficient to authorize the Rule, an analysis under *Turner* is superfluous, even in that minority of cases where it is applicable.[7] The precedents cited by the separate opinion that apply *Turner* to actions brought by non-prisoners are not to the contrary, because in each case the impinged association or speech was *with* a prisoner. *See Overton v. Bazzetta*, ___ U.S. ____, 123 S. Ct. 2162 (2003) (applying *Turner* to family member's right to visit prisoners); *Thornburgh v. Abbott,* 490 U.S. 401 (1989) (applying *Turner* to publisher's right to send magazines to prisoners); *Keeney v. Heath,* 57 F.3d 579, 581-82 (7th Cir. 1995) (applying *Turner* and *Thornburgh* to regulation barring prison guards from marrying prisoners).[8]

At first glance, it may seem strange that the state would have powers to regulate the conduct of its employees,

---

[6]To hold otherwise would create the counter-intuitive result that the state has the power to prevent some employee associations only with the general population, but not with prisoners.

[7]The fact that plaintiffs here are employees of the state agency charged with the oversight of prisoners is only marginally relevant. Our analysis would be substantially the same with respect to a regulation affecting other vulnerable state employees. For example, state-employed armored car guards by the same analysis might be barred from associating with offenders, either directly or through offenders' family members or visitors, solely for the purpose of protecting the state's cash and without any alleged penological interest.

[8]In one Seventh Circuit case, the court applied *Turner* to an action by a prisoner to enforce the First Amendment right of prison guards to write to the prison review board in support of clemency petitions. *Shimer v. Washington*, 100 F.3d 506, 509 (7th Cir. 1996). While we believe that such petitions are more properly analyzed under the framework of *Pickering*, rather than *Turner*, we note that *Shimer* only found standing based on the association between guards and prisoners and based its application of *Turner* on the fact that this underlying association occurred "within prison walls." *Id.* at 508-09. The associations at issue here did not occur within these confines, rendering *Turner* inapplicable.

generally law-abiding citizens, in ways that were they exercised over prisoners, generally convicted criminals, would constitute a constitutional violation. Surely any regulation that would under *Turner* violate the Constitution, if applied to prisoners, must *a fortiori* do so if applied to state employees? Yet, that is not always true, because state employee regulations have a lesser constitutional impact than prisoner regulations because they merely place a limited, voluntary burden on the exercise of a right, rather than impose an outright ban. State employment, in contrast to incarceration, is voluntary and while state employees do not waive their constitutional rights, accepting state employment involves a modicum of consent to regulation that is not present for prisoners. Moreover, while punishment for the violation of an employee regulation extends only up to discharge, punishment for the violation of a prisoner regulation extends up to lengthened incarceration. For these reasons, some conduct that could not be enjoined or prohibited for prisoners can be for state employees. So for example, the state can extract pledges to support the Constitution from employees and licensees (such as members of the bar), but cannot do so from prisoners.

### III

For the foregoing reasons, the district court's judgment is **AFFIRMED**.

---

**CONCURRING IN PART, DISSENTING IN PART**

---

CLAY, Circuit Judge, concurring in part and dissenting in part. The majority applies both the *Pickering/Connick* balancing test and the *Zablocki* "direct and substantial interference" test to Plaintiffs' challenge to various iterations of the MDOC Work Rule. As to the *Pickering/Connick* balancing test, the majority opinion correctly distinguishes between government employee speech that is a matter of public concern and that which is a matter of private concern. Restrictions on the former are subject to "intermediate scrutiny" – a balancing between the interests of the employee and the interests of the government. Private concern speech, by contrast, is subject to rational basis review. Although it is true that this Court has applied the *Pickering/Connick* test to restrictions on associations, *see Boals v. Gray,* 775 F.2d 686, 692 (6th Cir. 1985), such an application may not always do justice to the particular associational interests at stake. For example, the right to marry is recognized as a fundamental associational interest. Marriage, however, is purely a matter of private concern. Thus, it receives insufficient protection when applying the *Pickering/Connick* test. *See Balton v. City of Milwaukee,* 133 F.3d 1036, 1039-40 (7th Cir. 1998) ("A *Pickering/Connick* balancing test, so useful in resolving public employee free speech cases, is not easily transferable to freedom of association cases. That's because some associational choices – for instance, whom to marry – are purely private matters. As such, one would think they would usually come up short in a private versus public concern balancing test.") (citation omitted).

As to the *Zablocki* "direct and substantial interference" test, this Court has held that, in the employment setting, strict scrutiny applies to a governmental policy or action that "is a direct or substantial interference" with the asserted associational interest. *Montgomery v. Carr,* 101 F.3d 1117,

1124 (6th Cir. 1996) (citing *Zablocki v. Redhail,* 434 U.S. 374, 383-84 (1978)). If the policy or action does not directly or substantially interfere with that interest, then rational basis review applies. *Id.*

The majority is not without a precedential basis for applying these two tests to the associational rights of correctional employees. *See, e.g., Ross v. Clayton County,* 173 F.3d 1305, 1310-12 (11th Cir. 1999) (applying *Pickering/Connick* test to correctional officer's claim that his demotion for associating with his probationer-brother violated his First Amendment rights); *Serrano v. Multnomah County,* No. 01-36043, 2003 WL 1827230, at *1 (9th Cir. Apr. 7, 2003) (applying *Zablocki* "direct and substantial" test to claim by juvenile group detention worker that her termination for having a personal relationship with a juvenile detainee violated the First Amendment). But the Supreme Court has made it quite clear that prisons are unique to other governmental settings and that, regardless of whether the plaintiffs are prisoners or non-prisoners, there is a single test for the propriety of governmental action that arguably restricts First Amendment rights – the four-factor "legitimate penological interests" test, most recently applied in *Overton v. Bazzetta,* ___ U.S. ___, 123 S. Ct. 2162 (2003). The majority, like the district court below, failed to apply this test to the facts of this case. As a consequence, I disagree with the majority's reasoning and concur only in part with its judgment.

**I.**
**FACTUAL OVERVIEW**

Plaintiffs challenge various iterations of the MDOC Work Rule that prohibits, *inter alia,* non-work-related contact between MDOC employees and inmates, parolees, probationers or their family members and inmates' visitors. This prohibition originally was contained in the MDOC's Work Rule 12. That Rule prohibited "[i]mproper or overly familiar conduct with prisoners, parolees or probationers or

their family members and visitors." (J.A. 34.) Violations of the Rule subjected the employee to "disciplinary action up to and including dismissal." *Id.* Examples of improper actions included exchanging "letters, money or items" with a prisoner; living with a probationer or parolee, except where the probationer or parolee was a spouse of the employee and the marriage existed prior to the employment date, or where the spouse became a probationer or parolee after the employment date and the marriage was pre-existing; being at the home of a prisoner, parolee or probationer other than for official business; giving a prisoner the employee's home telephone number; and sexual contact with a prisoner. *Id.* Work Rule 12 also required that "[a]ny contact" with a prisoner, parolee or probationer, or their family members outside of the job be reported to the Warden. (J.A. 35.) Examples of unauthorized contact included contact with a prisoner by writing or by telephone outside of the official work setting and visiting prisoners without authorization.

The MDOC repromulgated Work Rule 12 as Work Rule 24 in June of 1996. Work Rule 24 prohibited MDOC employees from "overly familiar conduct with prisoners, parolees, probationers, family member(s) of a prisoner, parolee or probationer, or visitors." (J.A. 293.) The Rule prohibited romantic or sexual contact with such individuals as well as "any contact" with such individuals "outside the performance of the employee's job." *Id.* The Rule required the MDOC employee to report "any unavoidable contact" to his or her immediate supervisor. *Id.* The supervisor would then determine whether a written report of the contact should be sent to the employee's warden.[1] Examples of prohibited

---

[1] Like its predecessor, Work Rule 24 also prohibited the MDOC employee from living with or providing lodging for a prisoner, probationer or a parolee, except for the employee's parents or children or where the employee's marriage to the offender existed prior to the employment date or where the spouse became an offender after the employment date. Work Rule 46, which superseded Work Rule 24, relaxed this prohibition by permitting lodging for a sibling. The plaintiffs

contact with offenders, their family members or visitors included exchanging "letters, money, telephone numbers or anything," being at the home of any of these individuals for reasons other than official MDOC business and "[n]on-work related contact" with any of these individuals. *Id.* at 294. Any violations of the Work Rule would be grounds for dismissal.

Effective September 17, 1999, MDOC Work Rule 24 was abolished and new Work Rule 46 was implemented. Work Rule 46 defined the term "offender" to mean a "prisoner or parolee under the jurisdiction of the Michigan Department of Corrections or housed in a Department facility, or a probationer who is supervised by an employee of the Department." *Id.* It preserved Work Rule 24's prohibitions against (1) overfamiliarity with an offender, their family members or their visitors; (2) contact with such individuals outside the regular performance of the employee's job; and (3) the duty to report unavoidable contact. The new Work Rule also provided the same examples of prohibited contact, such as receiving letters, money or telephone numbers; being at the home of any such individual other than for official business; and any other non-work-related contact.

On April 24, 2000, the MDOC promulgated a revised Work Rule 46. The revised Rule defined "family member" to mean "parents, stepparents, spouse, children, stepchildren, siblings or step siblings." (J.A. 297.) It also changed the prohibition against contact with a prisoner's visitors to a prohibition against contact with "lead visitors," defined to mean a person on an offender's approved visitors list. *Id.* The revised Rule preserved the prohibition against the provision of lodging for certain offenders and similarly continued to require the reporting of unavoidable contact with offenders, their family members or their visitors. The revised Rule also continued to prohibit "any contact" with an offender outside the regular

---

do not challenge this portion of the Work Rule.

performance of an employee's job and preserved the various examples of overfamiliarity from the prior Rule (e.g., letter-writing, being at the residence of an offender). The revised Rule somewhat relaxed the prohibition against any contact with an offender's family members or visitors outside of the job by permitting such contact with prior written approval. The Rule omitted language that any violation would be grounds for dismissal, but still appeared to acknowledge that an employee could be discharged for violating the Rule.

In Michigan, there are approximately 13,000 people on parole, 65,000 people on probation and 45,000 people incarcerated. Thus, Work Rule 46 prohibits any non-work-related contact between any of the 17,000 MDOC employees and approximately 120,000 Michigan "offender" residents. There are no clear figures in the record as to how many family members the 120,000 offenders have, but it is estimated to be in the hundreds of thousands.

The MDOC terminated Plaintiff Dawn Akers, a bookkeeping clerk at a correctional facility, pursuant to former Work Rule 24 because she had given a parolee several rides in her car during her off-duty hours (to the hospital and to Lansing for a job search). Pursuant to former Work Rule 12, the MDOC terminated Plaintiff Kim Loranger, a probation officer, who had written a few letters to an inmate whom she had dated eight years earlier, before the inmate had been incarcerated. Both Plaintiffs have since been reinstated to their employment, however, both seek to have the discipline for violating the Work Rules expunged from their employment records. Plaintiff Loranger and Plaintiff UAW Local 6000 seek to prospectively invalidate the current Work Rule 46.

## II.
## PLAINTIFFS' CLAIMS AGAINST DEFENDANTS IN THEIR OFFICIAL CAPACITIES

### A. Legal Standards

In *Overton v. Bazzetta,* ___ U.S. ___, 123 S. Ct. 2162 (2003), the Supreme Court addressed the validity of the MDOC's prison visitation policies which, among other things, limited the visitors a prisoner was eligible to receive. The asserted goal of the regulations was to decrease the total number of visitors because prison officials had found it more difficult to maintain order during visitation and to prevent smuggling or trafficking in drugs. *Bazzetta,* 123 S. Ct. at 2166. The plaintiffs included prisoners, their friends and their family members. *Id.* The Court acknowledged that "*outside the prison context,* there is some discussion in our cases of a right to maintain certain familial relationships, including association among members of an immediate family and association between grandchildren and grandparents." *Id.* at 2167 (emphasis added; citations omitted). The challenge to the MDOC's prison visitation policies, however, was "not an appropriate case for further elaboration of those matters." *Id.* The Court reasoned that "freedom of association is among the rights least compatible with incarceration" and that "[s]ome curtailment of that freedom must be expected in the prison context." *Id.* The Court therefore held that the MDOC's policies did not unduly infringe on the prisoners' rights of intimate association because "the challenged regulations bear a rational relation to legitimate penological interests." *Id.* (citing *Turner v. Safley,* 482 U.S. 78, 89 (1987)).

Although the Court in *Bazzetta* did not separately discuss the standard of scrutiny applicable to the intimate association rights of prisoners' friends and family members, the Court acknowledged that the plaintiffs included friends and family members of prisoners. Moreover, the Court previously had held that the associational rights of non-prisoners are no greater than the rights of prisoners with whom they wish to

associate. *See Thornburgh v. Abbott,* 490 U.S. 401, 410 fn.9 (1989) (holding that the "legitimate penological interests" standard applies to alleged associational infringements on prisoners and non-prisoners alike). Logically, therefore, the "legitimate penological interests" test should apply in this case, where correctional officers, although not prisoners themselves, are integrally related to the prison setting and wish to associate with former inmates and/or inmates' family members. *See Shimer v. Washington,* 100 F.3d 506, 509 (7th Cir. 1996) (applying *Thornburgh v. Abbott* to claimed First Amendment right of prison guard to write to a prisoner review board on behalf of prisoners who had filed petitions for clemency); *Keeney v. Heath,* 57 F.3d 579, 581-82 (7th Cir. 1995) (applying *Thornburgh v. Abbott* to claimed First Amendment right of prison guard to marry a prisoner without being threatened with termination).

The majority argues that the Work Rule mostly implicates associations with non-prisoners, such as relatives and visitors of offenders. It therefore concludes that the "legitimate penological interests" test is inapplicable to the Work Rule because "in general there is no prisoner nexus, but there always is an employment nexus." This argument defies common sense and ignores the undisputed facts of this case. The MDOC has sought to justify the Work Rule as it applies to both the offender class and the class of relatives and visitors based *solely* on the Rule's relation to the preservation of prison security. But for the asserted security concerns implicated by MDOC employees' contacts with both classes of individuals, there would be no Work Rule. If, as the majority states, there is "in general no prisoner nexus," then it is difficult to see how the Work Rule survives even rational basis scrutiny. The Work Rule is nothing like employment regulations that require pledges to support the Constitution or preclude moonlighting or partisan political activity, which typically would be based on the employer's general interest in maintaining employee morale or an efficient and loyal workforce. These types of employment regulations are not necessitated by or unique to the prison setting. In contrast,

prisoners undeniably are the reason for the MDOC's Work Rule. The fact that the Rule can be classified more generally as an employment regulation should not blind this Court to the specific reality that it is a prison regulation. Accordingly, the "legitimate penological interests" test is not "superfluous," as the majority claims.

The "legitimate penological interests" standard is highly deferential to prison administrators. Although "[w]e must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining legitimate goals of a corrections system and for determining the most appropriate means to accomplish them," *Bazzetta,* 123 S. Ct. at 2167-689 (citations omitted), this deference is by no means absolute. Accordingly, the Supreme Court has provided the following guidance in assessing whether a prison regulation serves legitimate penological interests:

> In *Turner* we held that four factors are relevant in deciding whether a prison regulation affecting a constitutional right that survives incarceration withstands constitutional challenge: whether the regulation has a "valid, rational connection" to a legitimate governmental interest; whether alternative means are open to inmates to exercise the asserted right; what impact an accommodation of the right would have on guards and inmates and prison resources; and whether there are "ready alternatives" to the regulation.

*Id.* (citing and quoting *Turner,* 482 U.S. at 89-91; internal quotation marks and citation omitted). The party seeking to invalidate the prison regulation bears the burden of proof regarding these four factors. *Id.* at 2168. As discussed below, even under this highly deferential test, parts of the challenged MDOC Work Rule are unconstitutional.

## B.  Analysis

### 1.  Valid, rational connection to a legitimate governmental interest

Regulations that promote internal security are "perhaps the most legitimate of penological goals," *Bazzetta,* 123 S. Ct. at 2168 (citation omitted); however, there still needs to be a "logical connection between this interest and the regulations." *Id.* (MDOC's regulations "prohibiting visitation by former inmates bears a self-evident connection to the State's interest in maintaining prison security and preventing future crimes"). The logical connection between the regulation and the asserted goal cannot be "so remote as to render the policy arbitrary or irrational." *Turner,* 482 U.S. at 89-90. Moreover, where "the nature of the asserted governmental interest is such as to require a lesser degree of case-by-case discretion, a closer fit between the regulation and the purpose it serves may safely be required." *Abbott,* 490 U.S. at 412; *see also id.* at 416 ("we are comforted by the individualized nature of the determinations required by the regulation" which prohibited a prisoner from receiving a publication only when the warden determined that it was "detrimental to the security, good order, or discipline of the institution or … might facilitate criminal activity") (internal quotation marks and citations omitted).

In *Turner,* the Court found that a prison rule barring inmate-to-inmate correspondence was reasonably related to legitimate security interests. *Turner,* 482 U.S. at 91. The Court observed, "Undoubtedly, communication with other felons is a potential spur to criminal behavior:  this sort of contact frequently is prohibited even after an inmate is released on parole." *Id.* (citation omitted). The Court upheld the regulation because it barred communication only with a "*limited class*" of other people with whom prison officials have *particular cause* to be concerned – inmates at other institutions within the Missouri prison system." *Id.* at 92 (emphases added).

### a.  Contact with inmates, parolees and probationers

The reasoning in *Turner* easily can be applied to the portion of the  challenged MDOC Work Rule that prohibits non-work-related relationships with prisoners or former prisoners. MDOC officials have asserted that any type of non-professional relationship with an offender is cause for discharge because of "serious security concerns in correctional facilities and concerns regarding the integrity of supervision of offenders in communities." (J.A. 215.) (Affidavit of Marsha Foresman, Special Assistant to the MDOC Director, at ¶ 6).[2]  I agree, based on *Turner,* that relationships between MDOC employees and inmates or former inmates could be a spur to criminal behavior or facilitate criminal behavior.  Personal relationships with inmates and former inmates, whether romantic or otherwise, could undermine security and order in the prison or the integrity of the probation supervision process. *Cf. Keeney,* 57 F.3d at 581 (holding that a guard's romantic involvement with an inmate could make her "a potential facilitator of unlawful communication between [the inmate] and others and a potential provider of favored treatment for him").

---

[2] *See also* (J.A. 319) (Affidavit of Richard E. Johnson, Assistant Deputy Director of the Correctional Facilities Administration at, ¶ 11) ("I am aware of several examples of employees who have smuggled contraband into a facility due to the development of a personal relationship with a prisoner …."); (J.A. 223) (Affidavit of Dan L. Bolden, Deputy Director of the Correctional Facilities Administration, at ¶ 8) ("Employees who become involved in [personal] relationships with prisoners are at risk to become involved, often against their will, in bringing contraband into the prison, including money, drugs, and weapons, and assisting in escape plans, plans to create disturbances, or plots to retaliate against staff and other prisoners."); J.A. 217 (Affidavit of Robert Steinman, Deputy Director of the MDOC's Field Operations Administration, at ¶ 5) ("Any appearance of impropriety on the part of the [parole or probation] agent can compromise the employee's authority and control over the probationer and parolee and can result in serious ramifications, ranging from lax and inadequate supervision to actual falsifying of reports and information regarding the individual being supervised.")

The fact that a particular MDOC employee has no explicit supervisory authority over the offender and may have little or no ability to effect changes to the offender's status does not change the analysis. In establishing prison regulations, "a line must be drawn." *Bazzetta,* 123 S. Ct. at 2168 (reasonable to limit child visitors by prohibiting visits by nieces, nephews and children as to whom parental rights had been terminated). It is reasonable for the MDOC officials to conclude that (a) the risk to prison security is too great, however remote that risk may be in the vast majority of relationships with offenders; and (b) even innocent relationships with offenders tend to undermine offenders' respect for the prison authorities, thereby comprising the authority and control of those MDOC employees who actually supervise them. This Court also cannot ignore the potential administrative costs that the MDOC would incur by having to conduct a case-by-case assessment of relationships with offenders.

For these reasons, I agree with the majority as far as Work Rule 46 legitimately prohibits any non-work-related relationships between MDOC employees and offenders, with one caveat. As presently written, Work Rule 46 prohibits "any contact" with an offender outside the regular performance of an employee's job and further imposes a duty to report any "unavoidable contact" to a superior and potentially to the Warden. (J.A. 298.) As far as potential discipline is concerned, the Rule draws no distinction between intentional contact with an offender outside of work and incidental or even unknowing contact. In this regard, Plaintiffs have complained that MDOC employees could not attend an Alcoholics Anonymous meeting, a political campaign meeting, a religious service, a PTA meeting or a bowling league event if any attendees at those meetings are on parole or probation. *Appellants Br.* at 12. In addition, Michael Devine, a union representative with Plaintiff UAW Local 6000, testified that at one point in time there were twelve homes on his block in which 12 offenders lived. If he were still employed as a probation officer with the MDOC, he could not have any contact with his neighbors. Plaintiffs

point out that such contacts would be unavoidable, yet would be cause for termination.

I submit that the Rule is not reasonably related to legitimate penological interests to the extent it prohibits, without exception, certain incidental contacts with probationers and parolees at church functions, political meetings and the like. Probationers and parolees are a significant percentage of the population, particularly in urban areas. To require MDOC employees to extricate themselves from community events and organizations in which offenders also happen to participate represents a significant intrusion on the employees' personal liberty. Preventing such incidental contacts with offenders bears only the remotest relation to the preservation of prison security and the avoidance of conflicts of interest. *See Turner,* 482 U.S. 89-90 (holding that the logical connection between the regulation and the asserted goal cannot be "so remote as to render the policy arbitrary or irrational"). Indeed, the evidence submitted by MDOC in support its Work Rule relates to problems with *personal relationships* between employees and offenders, not to mere *contact* between them. *See* note 2, *supra.* Thus, only when the contact is intentional and repetitive, evolving into a relationship, should MDOC's penological interests even come into play. The lack of a case-by-case exception for such incidental contact confirms the lack of a close fit between the Work Rule's prohibition and the asserted penological interests. *See Abbott,* 490 U.S. at 412 (where "the nature of the asserted governmental interest is such as to require a lesser degree of case-by-case discretion, a closer fit between the regulation and the purpose it serves may safely be required"). I would hold that the blanket prohibition against incidental contact with probationers and parolees fails the first prong of the *Turner* test.

Further, as currently formulated, Work Rule 46 provides that a MDOC employee can be terminated if he or she attends a church event or a political event also attended by probationers or parolees, even if he or she does not know that

any of the attendees are on parole or probation. This "strict liability" approach bears no logical relation to the asserted penological interests of preventing MDOC employees from using their positions to compromise prison security or avoiding conflicts of interest. At a minimum, I would limit the prohibition against non-work-related contacts with probationers and parolees to situations where the MDOC employee knew or should have known that he or she had contact with such an offender.

### b. Contact with family members of offenders and inmates' visitors

The more troubling proposition is whether *Turner* can be interpreted to prohibit contacts or communications with individuals who are not subject to the MDOC's jurisdiction, but who are family members of such individuals. Such family members are a "limited class" in the strictest sense of the term – i.e., there are a finite number of such individuals; however, the size of the class is significant, in the hundreds of thousands. Moreover, because family members are a diffuse class, they likely are not identifiable to MDOC employees in many cases. A MDOC employee would not know that an individual he or she meets outside of work is a family member of an offender; he or she may not become apprised of this fact if the individual never volunteers it. Yet the MDOC employee's job is in jeopardy, regardless of what the employee actually knows or should know about the individual's relationship to an "offender." Thus, the family member classification does not constitute a "limited class" in the sense that the *Turner* Court applied the term to a discrete, relatively small and readily-identifiable group (there, prison inmates who were confined in a single location).

The next question is whether prison officials have "particular cause" to be concerned about such family members. In this regard, the MDOC has submitted an affidavit from Robert Steinman, the Deputy Director of the Field Operations Administration, who is responsible for the

oversight and operation of adult felony probation and parole services. According to Steinman:

> An employee who is involved in other than a professional relationship with a probationer or parolee, or family members of the probationer or parolee, may be persuaded or coerced to misuse his/her position to benefit the parolee or probationer, and/or friends and family of the parolee or probationer. This concern is not limited only to parole and probation agents. Administrative support staff working in field offices and in Central Office are vulnerable as well, having access to may [sic] types of records which can be tampered or altered. For example, administrative support staff may have access to reports of drug testing results regarding parolees and probationers. The employee could, either willingly or under threat, manipulate data and records to change those reports. Other records could be manipulated to affect a probationer or parolee's record of compliance with special conditions, work reports, payment of restitution, etc. An agent could be coerced into using his/her position to gain access to parolees and probationers who are housed in county jails for violations of parole or probation, and even could affect [sic] the release of an individual from county jail under false pretenses. These are just some examples of improper use of position which can result from non-professional relationships between employees and parolees, probationers, and their families.

(J.A. 217-18) (Steinman Aff. at ¶ 6).

No doubt the MDOC has identified some conceivable harms that a compromised MDOC employee could inflict on the correctional system. Arguably, the risk of at least some of these harms being facilitated by former inmates who strike up relationships with MDOC employees is "self-evident." *Cf. Bazzetta,* 123 S. Ct. at 2168 (MDOC's regulations "prohibiting visitation by former inmates bears a self-evident

connection to the State's interest in maintaining prison security and preventing future crimes"). But the risk of harm, although conceivable, is not self-evident in the case of family members of offenders and inmates' visitors, who, as far as anyone knows, are and have always been upstanding citizens. By definition, family members and visitors are not offenders. Unless they have been found guilty of a crime outside of Michigan, family members and visitors have not been "convicted of felonious behavior, which often involves dishonesty, fraud, and coercion." (J.A. 219) (Steinman Aff. at ¶ 9). Indeed, the MDOC has not cited a single example of a MDOC employee using his or her position to carry out, whether willingly or under duress, any improper favors for family members or visitors. Thus, the MDOC has not based its prohibition against relationships with family members or visitors on "particular cause," but on "questionable speculation" that such contacts conceivably could threaten prison security. *Cf. California First Amendment Coalition v. Woodford,* 299 F.3d 868, 880 (9th Cir. 2002) (regulation that barred outsiders from witnessing administration of lethal injection was not justified by alleged interest in protecting execution team members from being publicly identified and subjected to retaliation; evidence in the record showed that regulation was an "overreaction, supported only by questionable speculation"); *see also Shimer,* 100 F.3d at 510 ("We … are reduced to speculation when not provided with evidence, and, having speculated, find it difficult to establish a connection between the prison administration's unsubstantiated justifications and its policy" of prohibiting correctional employees from contacting the Prisoner Review Board on behalf of prisoners.").

For these reasons, the former Work Rule's blanket prohibition on contact with family members of offenders and inmates' visitors is unconstitutional. Although the revised Work Rule now permits such contacts with prior written approval from the prison authorities, the Rule provides absolutely no standards to guide prison administrators in the exercise of their discretion. I would direct the MDOC to a

Federal Bureau of Prisons regulation on visitation by friends and associates which, by analogy, strongly suggests that incorporating specific standards into the MDOC's family member/visitor exception is feasible. According to that regulation:

> The visiting privilege ordinarily will be extended to friends and associates having an established relationship with the inmate prior to confinement, unless such visits could reasonably create a threat to the security and good order of the institution. Exceptions to the prior relationship rule may be made, particularly for inmates without other visitors, when it is shown that the proposed visitor is reliable and poses no threat to the security or good order of the institution.

28 C.F.R. § 540.44(c). *See also Abbott,* 490 U.S. at 416 ("we are comforted by the individualized nature of the determinations required by the regulation" which prohibited a prisoner from receiving a publication only when the warden determined that it was "detrimental to the security, good order, or discipline of the institution or … might facilitate criminal activity") (internal quotation marks and citations omitted). Applying a standard like "reasonable threat to security and good order" would serve to focus the MDOC on concrete criteria that specifically relate to its interest in maintaining prison security, making it less likely that the MDOC would render, or create the appearance of, arbitrary determinations that have nothing to do with its penological interests.

To summarize, the revised Work Rule 46 is reasonably related to a legitimate penological interest to the extent it prohibits relationships between MDOC employees and inmates, probationers or parolees, but not to the extent it bars incidental or unknowing contact with such individuals. The Rule is not related to a legitimate penological interest to the extent it (a) prohibits unknowing or incidental contact with family members of offenders or inmates' visitors and

(b) prohibits contact with family members or inmates' visitors, subject only to a case-by-case exception that fails to take into account prison security, or any other factor.

### 2.    Alternative means of exercising associational rights

When examining prison regulations, "[w]ere it shown that no alternative means of communication existed, though it would not be conclusive, it would be some evidence that the regulations were unreasonable." *Bazzetta,* 123 S. Ct. at 2169. Here, Plaintiff Loranger complains that Work Rule 46 prevents her from visiting with Rebecca Contreras, her closest friend for the past 15 years, because Contreras' son is on probation. Likewise, the Rule has prevented Contreras from participating in Loranger's childbirth, attending the baptism of Loranger's child and actively serving as the Godmother of Loranger's child. Although Loranger requested permission to have contact with Contreras, the MDOC denied her request. Plaintiffs also complain generally that the Rule prohibits MDOC employees from attending Alcoholics Anonymous meetings, political campaign meetings, religious services and PTA meetings, when any attendees at those meetings are on parole or probation.

Alternative means of participation in these associational activities exist only if Plaintiffs leave their employment with the MDOC (an alternative the majority cavalierly calls a "simple expedient"). But because the challenged prison regulations are unreasonable, Plaintiffs are not required to quit their jobs to enjoy these rights. *Compare Keeney,* 57 F.3d at 581-82 (holding that prison work rule that forbade social involvement with inmates did not impermissibly burden prison guard's right to marry by forcing her to quit in order to marry an inmate; regulation served "plausible" concerns of prison in avoiding conflicts of interest and the appearance of favoritism). Rather, the question is whether, *as MDOC employees,* Plaintiffs have alternative means of carrying out their otherwise-protected associational activities without fear of being terminated. Clearly, they do not. They

are absolutely prohibited from engaging in any associational activities that result in incidental or unknowing contact with probationers and parolees. Additionally, subject only to the unfettered discretion of prison officials, MDOC employees are prohibited from contact with offenders' family members and inmates' visitors, with whom they may have had long-standing, pre-existing personal relationships.

### 3.    Impact of accommodation on prisoners, guards and resources

Any alternative to the MDOC regulations must avoid a "significant reallocation of the prison system's financial resources [that] would impair the ability of corrections officers to protect all who are inside a prison's walls." *Bazzetta,* 123 S. Ct. at 2169. Only when the proposed alternative "will have a significant 'ripple effect' on fellow inmates or on prison staff, [should courts] be particularly deferential to the informed discretion of corrections officials." *Turner,* 482 U.S. at 90 (citation omitted).

It appears that there would little, if any, reallocation of prison resources if this Court were to require the MDOC to create an exception for unknowing or incidental contact with probationers and parolees. The MDOC already has adopted a case-by-case exception procedure for contacts with family members of offenders and inmates' visitors, which by all estimates, constitute a far greater population than the probationer/parolee population. There is no indication in the record that the adoption of this exception would result in a crush of requests from MDOC employees. As noted above, there is no evidence that such incidental or unknowing contacts would pose a threat to prison security.

Furthermore, there would be no effect on prison resources as a result of requiring the MDOC to apply specific standards to its current policy of granting case-by-case exceptions to the prohibition against contact with offenders' family members and with inmates' visitors. In fact, the MDOC is likely to

save resources by following uniform standards that do not have to be re-invented each time a request is submitted. In addition, by incorporating the concept of prison security into the standards, the MDOC's legitimate penological interests would be advanced.

### 4.    Ready alternatives to the regulations

The "existence of obvious, easy alternatives [to prison regulations] may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns." *Turner,* 482 U.S. at 90. Although this factor is not a "least-restrictive-means" test*, id.*, prison regulations are unreasonable if there is "some obvious regulatory alternative that fully accommodates the asserted right while not imposing more than a *de minimis* cost to the valid penological goal." *Bazzetta,* 123 S. Ct. 2162 (citing *Turner,* 482 U.S. at 90-91).

As discussed in the preceding section, there are obvious regulatory alternatives that fully accommodate the MDOC's interest in preserving prison security and avoiding conflicts of interest in the context of contacts with parolees, probationers, family members of offenders and visitors. The creation of an exception for incidental or unknowing contact with parolees and probationers, as well as the institution of specific standards for contacts with family members of offenders and visitors would impose a *de minimis*, if any, cost on the MDOC; even under the present version of Work Rule 46, the MDOC is incurring the cost of case-by-case determinations about the permissibility of contacts with family members and visitors. Without these common-sense modifications, Work Rule 46 is an exaggerated – indeed, ridiculous – response to the MDOC's legitimate concern over maintenance of prison security.

Based on the foregoing, I concur that the grant of summary judgment to the MDOC on Plaintiff Akers' and Plaintiff Loranger's claims was appropriate. It is undisputed that both Akers and Loranger had purposeful contacts with a parolee in

violation of former Work Rule 24 (Akers) or with an inmate in violation of former Work Rule 12 (Loranger). Thus, disciplinary action against them did not violate their constitutional right to freedom of association. Nevertheless, Plaintiff Loranger and Plaintiff UAW Local 6000 are entitled to a declaration that the revised Work Rule 46 is unconstitutional to the extent it imposes discipline for: (1) unknowing or incidental contact with offenders, family members of offenders or inmates' visitors or (2) contact with family members of offenders or inmates' visitors, subject only to a standardless exception process.

### III.
### QUALIFIED IMMUNITY

Since neither Akers nor Loranger suffered a constitutional harm stemming from their discipline for violating the Work Rules, the individual Defendants are entitled to qualified immunity. *See Saucier v. Katz,* 533 U.S. 194, 201 (2001) ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity."). Regardless, there appears to be no basis to find that the right of prison employees to engage in particular associational activities with probationers or parolees was "clearly established," *id.,* given the dearth of case law applying the four-part *Turner* test to the regulation of employment conditions in a prison setting. Accordingly, I concur with the majority's judgment that Defendants were entitled to qualified immunity to the extent they were sued in their individual capacities.[3]

---

[3] I do take issue with the majority's statement that Defendants are entitled to qualified immunity because "a United States District Court Judge, given the benefit of decades of legal training and practice, years of hearings and adversarial briefings by able counsel, was unable to find … a violation." With all due respect, my brethren in the district courts have been known to commit legal error, including plain error through the failure to cite and apply clearly established legal precedent. If a district judge's opinion of the state of the law were somehow dispositive of the

### IV.
### CONCLUSION

For the foregoing reasons, I **CONCUR** that the district court properly granted summary judgment on Plaintiff Akers' and Loranger's claims for unconstitutional discipline. I also **CONCUR** in the majority's judgment that the individual Defendants are entitled to qualified immunity. I **DISSENT** to the extent the district court should have granted Plaintiff Loranger and UAW Local 6000's request for prospective relief regarding certain aspects of Work Rule 46. Work Rule 46 legitimately bars non-work-related relationships between MDOC employees and offenders, but the prohibition against all non-work-related contact with probationers and parolees should be limited to situations where the MDOC employee knew or should have known that such individuals were offenders. The prohibition also should contain an exception for incidental contact with such offenders. Work Rule 46 also is unconstitutional to the extent it bars (a) any unknowing or incidental contact with family members of offenders or inmates' visitors and (b) permits such contacts, subject only to the MDOC's unfettered discretion to make exceptions without reference to any factors related to prison security, order or discipline.

---

qualified immunity issue, the Courts of Appeals rarely would have occasion to reverse a district judge's ruling on qualified immunity. Thus, whether a district judge failed to find a constitutional violation should not control this Court's analysis of the issue.